**WEST BRANCH STATE BANK, Appellant,**

v.

**Ferral L. GATES, Brenda Lee Gates, Appellees,**

and

**Darrell H. Roegler, Florine G. Roegler, Paul B. Gilbaugh and Mildred L. Gilbaugh, Defendants.**

No. 90–579.

Supreme Court of Iowa.

Nov. 20, 1991.

Richard K. Updegraff and Jill Thompson Hansen of Brown, Winick, Graves, Donnelly, Baskerville & Schoenebaum, Des Moines, for appellant.

Peter C. Riley of Tom Riley Law Firm, P.C., Cedar Rapids, and Robert L. Horak of Horak & Rasmussen, Jefferson, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, NEUMAN and ANDREASEN, JJ.

ANDREASEN, Justice.

In this foreclosure action, we review the financial transactions between the creditor, West Branch State Bank (bank) and the debtors, Ferral and Brenda Gates. Also involved in the factual background of this suit is Ferral's brother, Gale Gates. Gale owned and operated an elevator known as Gates Grain Company, Ltd. (Grain Co.). Ferral owned and operated a trucking busi-

ness. Both Ferral and Gale and their businesses were customers of the bank.

In 1982, Gale decided to expand the grain storage capacity at the Grain Co. Eventually, Gale decided to construct two 350,-000 bushel bins. Gale did not, however, have the money necessary to buy or construct the bins. Apparently, both Gale and the Grain Co. had reached their credit limit at the bank. Since he could not obtain a loan himself, Gale persuaded Ferral to obtain a loan in Ferral's name for one of the bins Gale wished to construct. Ferral obtained a loan in the amount of $250,000 from the bank. The bank was aware that Ferral was borrowing the money for the benefit of Gale, although there was no surety, cosignature, or guaranty agreement on the loan to Ferral.

The loan was made to Ferral and his wife Brenda in September 1982. They signed a note requiring annual payments of $80,-852.50, due on December 15th of 1982, 1983, 1984, and 1985, with the balance due on December 15, 1987. Payments were first to be applied to interest (18.5%) and the balance to principal. The note was secured by a U.C.C. security agreement on the bin as well as a deed of trust upon an eighty-acre farm owned by Ferral.

The borrowed money was used to purchase the 350,000 bushel bin, which was erected on the Grain Co.'s property. Ferral received a bill of sale and was the owner of the bin, subject only to the bank's security interest. Ferral knew that the land upon which the bin was built was subject to a first mortgage to the Federal Land Bank. Ferral understood that Gale would turn over the storage income from the bin to him. These payments from Gale would in turn be paid over as loan payments to the bank. The first installment payment, due on December 15, 1982, was paid and applied to both interest and principal.

In 1983, the government implemented the PIK farm program. The demand for grain storage began to diminish. The annual payment due on December 15, 1983, was extended by agreement of the parties with Ferral paying only the interest due.

The first half of interest due in 1984 was paid to the bank. However, in December of 1984, Ferral received no storage income from Gale and accordingly did not make any payment on the bin loan. By agreement with the bank, the 1984 annual payment was extended and the interest due was paid with the proceeds from a new loan that Ferral obtained from the bank for that purpose. The 1985 annual payment was also extended, and the interest due was paid by Ferral with the proceeds from a second interest loan. Both of the interest loans were expressly secured by the original deed of trust and the security agreement on the bin.

Up until this time, Ferral was still the owner of the bin located on the Grain Co.'s property. However, sometime in 1985 or 1986, Ferral transferred his ownership interest in the bin to the Grain Co. Apparently, this transfer was made to allow the Grain Co. to reflect a higher net worth in an attempt to satisfy state and federal licensing regulations. At the request of the Grain Co.'s attorney, the bank also released its security interest in the bin. Ferral refused to borrow additional money from the bank to make interest payments on the bin loan. No payments on the bin loan were made to the bank in 1986.

The Grain Co. eventually had its license suspended, and in 1987, the Federal Land Bank, who held the first mortgage on the real estate of the Grain Co., began a foreclosure action. The bank was joined as a codefendant, because it held a second mortgage on the Grain Co.'s real estate arising from separate Grain Co. transactions. The Federal Land Bank completed foreclosure and, at the foreclosure sale in 1987, obtained a sheriff's certificate. Later, the bank bought the sheriff's certificate from the Federal Land Bank, and it currently owns the land upon which the bin is located.

The bank additionally, also from unrelated transactions, held a security interest in all the personal property of the Grain Co. In settlement of unrelated litigation, the bank acquired all of the personal property of the Grain Co., including the grain

bin. Thus, through unrelated transactions, the bank now has both possession and ownership of the grain bin and the land upon which it sits.

The bank commenced this foreclosure proceeding in July of 1987. It sought judgment and foreclosure with respect to the three notes relating to the bin. The bank also sought to foreclose on three additional loans and collateral unrelated to the bin and interest loans. Ferral and Brenda filed a counterclaim against the bank on several theories, including deceit, fraud and violation of the duty of disclosure.

In January 1989, Ferral filed a voluntary chapter 13 bankruptcy petition. When the automatic stay was lifted as against the eighty acres securing the bin debts, the bank proceeded with its suit. Because Ferral had taken bankruptcy, the bank sought an in rem judgment against the collateral and a personal judgment for any deficiencies against Brenda Gates, now Ferral's ex-wife.

Following trial, the court ordered foreclosure of the collateral securing the three notes unrelated to the bin loans. However, as to the bin loan and the two interest loans, the court denied foreclosure of the eighty acres. The court found that the parties intended the bin to be the primary security for the loan. Accordingly, the court held that allowing the bank to foreclose on the eighty acres of farmland would unjustly enrich the bank. The court concluded that foreclosure as to the eighty acres was premature:

> This Court ... finds that foreclosure against the farm property of the defendants Gates is in reality a claim for a deficiency judgment and that there is nothing in the record to establish the amount of said deficiency. If the bank establishes, by the sale of the "bin", an amount of loss, then there will be consideration for foreclosure. Until this fact is established, the Court finds that said foreclosure is premature and must fail.

The court dismissed the counterclaim.

The bank appealed and Ferral cross-appealed. The bank contends that the district court erred in concluding that any foreclosure of the eighty acres, prior to the sale of the bin and a determination of a deficiency, would result in unjust enrichment. The bank's position is that it cannot be unjustly enriched because it came into possession of the bin not in satisfaction of Ferral's debt, but in an unrelated settlement of the Grain Co.'s debts. It argues there was no express or implied agreement that the bin would be primary security for the bin loans.

Ferral's position on cross-appeal is that he is only a surety. He contends that his willingness to transfer the bin to the Grain Co. was conditional upon his understanding that the eighty acres which he owned at the time of the loan and pledged as security for the bin would also be released.

Because we conclude that foreclosure of the eighty acres is not premature, we reverse the district court's denial of foreclosure. We affirm the remainder of the district court order and decree.

### I. *Scope of Review.*

Foreclosure of a deed of trust is an action in equity. Iowa Code § 654.1 (1987). Accordingly, our scope of review is de novo. Iowa R.App.P. 4.

### II. *Foreclosure of the "Eighty Acres."*

#### A. Release of a Security Agreement.

■ There is no dispute that Ferral provided the bank with both real and personal property as collateral for the bin loan. Four years later, Ferral transferred his ownership of the bin to the Grain Co. and the bank released its security interest in the bin. Ferral urges the bank's release of its security interest in the bin impaired his rights as surety to discharge or reduce his obligation to the bank.

In Iowa, "[d]eeds of trust of real property may be executed as securities for the performance of contracts, and shall be considered as, and foreclosed like, mortgages." Iowa Code § 654.2. After Ferral had taken bankruptcy, the bank's only remedy was to proceed in rem and foreclose on the eighty-acre farm property.

Regarding foreclosure of both real and personal property we have said:

> [U]nder the Uniform Commercial Code, the secured creditor has several remedies which are cumulative. Iowa Code § 554.9501. The purpose of this section of the act is "to broaden the options available to a secured creditor upon a debtor's default."
>
> .    .    .    .    .
>
> [W]hen the secured creditor has security in both real and personal property, section 554.9501 gives the creditor the option, upon default, to proceed against the real and personal property collateral in separate actions, whether concurrently or successively. Hence, a creditor is not required to make an election of remedies. The creditor may pursue *any and all* remedies available against the debtor or until the debt is satisfied, without danger that any of these actions will constitute an irrevocable election of remedies.

*Brenton State Bank v. Tiffany*, 440 N.W.2d 583, 587 (Iowa 1989) (citations omitted) (emphasis added).

Furthermore, a secured party of record may by his signed statement release all or part of any collateral described in a filed financing statement. *See* Iowa Code § 554.9406.

A creditor has a clear right to proceed against either the real or personal property in separate actions and has a right to release collateral. We must determine whether the creditor can release some of the collateral without having the value of the released collateral credited to, or set off against, the underlying debt. Since the creditor has a right to choose which collateral to foreclose upon, we think that the creditor also has the right to release specific collateral without having its value credited or set off against the underlying debt.

Certainly, if the creditor has the right to proceed against either type of collateral in separate actions, he could choose to proceed solely against one or the other. The creditor is not compelled to foreclose on both types of collateral. A release of one of the types of collateral would have the same effect. The creditor would then only be able to proceed against that collateral not released. There are, however, exceptions to this general rule.

Where there is an agreement or promise by the creditor that it will specifically look towards certain collateral first, the creditor's rights are reduced. In such cases, the creditor cannot release the identified collateral without having the value of the released property credited to the underlying debt. If, after the credit, there remained a deficiency, then and only then can the creditor proceed to foreclose on the secondary collateral. This is the basis of the district court's order and decree. The court found there was an implied agreement that the bank would treat the bin as the primary security for the loan.

However, in our de novo review of the record, we do not find evidence that the bin was the primary security for the bin loan. There was no written agreement or documentation in any of the exhibits indicating that the bank was to look to the grain bin as the primary security. Furthermore, there was no testimony, not even by Ferral, that the bank agreed or promised to look to the grain bin as the primary security for the loan. Ferral's testimony as to his "understanding" does not establish an agreement with the bank. There is no presumption of an implied agreement between a creditor and a debtor that property acquired by a loan is to be the primary security for the loan.

Thus, we find that there was no promise or agreement, express or implied, between the parties that the bank would look to the grain bin as primary security. Because there was no promise or agreement to that effect, the bank could release its security interest in the bin without having the value of the bin credited to or set off against the underlying debt. This determination, however, does not address the issue of unjust enrichment.

B.  Unjust Enrichment.

Unjust enrichment is an equitable principle mandating that one shall not be permitted to unjustly enrich oneself at the

expense of another or to receive property or benefits without making compensation for them. *Johnson v. Dodgen,* 451 N.W.2d 168, 175 (Iowa 1990) (citation omitted). Although foreclosure actions are actions in equity and the equitable remedies of unjust enrichment and implied or quasi-contract may be appropriate in certain circumstances, such circumstances are not present here.

The district court found that the bank would be unjustly enriched if it were to be allowed to foreclose on the eighty acres without first having the value of the grain bin set off against Ferral's outstanding debt on the bin loan. Yet, Ferral transferred the bin to the Grain Co. so that the Grain Co. could reflect a higher net worth to regulators. The transfer of the bin to the Grain Co. and the release of the bank's security interest in the bin resulted in a reduction in the pledged security for Ferral's bin loans. The only security remaining on these loans was the eighty acres. Ferral was not coerced into transferring the bin, rather he did so voluntarily and gratuitously to help his brother. He cannot now claim that he is entitled to have the value of the bin applied to reduce his outstanding debt on the bin loan. There is no unjust enrichment.

### III. *The Cross Appeal: Suretyship.*

Ferral and Brenda claim the acts of the bank impaired their rights as sureties to discharge or reduce their obligation to the bank. This is the only issue raised in the cross-appeal.

We find this issue was not preserved for appellate review. Although the district court mentioned suretyship in its list of legal questions considered, the district court did not address the issue of suretyship in its order and decree. Neither party filed a motion to enlarge or amend the order and decree to address the issue. *See* Iowa R.Civ.Proc. 179(b). As we stated in *Estate of Grossman v. McCreary:*

> Such a motion is a condition precedent for preserving the "skipped" issues for appellate review ... "It is well settled that a rule 179(b) motion is essential to

preservation of error when a trial court fails to resolve an issue, claim, defense, or legal theory properly submitted to it for adjudication."

373 N.W.2d 113, 114 (Iowa 1985). Accordingly, we need not review the issue in the cross-appeal.

### IV. *Disposition.*

The district court erred in denying plaintiff judgment on the three promissory notes and foreclosure of the land described in the deed of trust. We reverse and remand for entry of judgment and decree of foreclosure. We affirm the remainder of the court's order and decree.

REVERSED AND REMANDED ON APPEAL, AFFIRMED ON CROSS-APPEAL.