ROBERT'S RIVER RIDES,
INC., Appellant,

v.

STEAMBOAT DEVELOPMENT
CORPORATION and City of
Bettendorf, Appellees.

CITY OF BETTENDORF, Appellee,

v.

STATE Of Iowa, Appellee.

No. 93–710.

Supreme Court of Iowa.

July 27, 1994.

Rehearing Denied Sept. 21, 1994.

William Fuerste, Stephen J. Juergens and Gregg L. Owens of Fuerste, Carew, Coyle, Juergens & Sudmeier, P.C., Dubuque, for appellant.

Thomas D. Waterman of Lane & Waterman, Davenport, and Robert G. Ellis, Bettendorf, for appellees Steamboat Development Corp. and City of Bettendorf.

Bonnie J. Campbell, Atty. Gen., and Michael H. Smith, Asst. Atty. Gen., for appellee State.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.

ANDREASEN, Justice.

This appeal involves a dispute over a lease for a portion of the bed of the Mississippi River. An excursion boat operator brought this action against a municipality and a competing operator claiming damages for interference with its leasehold interest. The district court granted defendants' motion for summary judgment dismissing plaintiff's claims of trespass, conspiracy, conversion, implied contract, intentional interference with contract, and defamation. We affirm.

I. *Background and Factual Proceedings.*

Robert's River Rides, Inc. (Roberts) operated passenger excursion boats on the Mississippi from Leach Park in Bettendorf, Iowa between May 1984 and December 1990. Leach Park abuts the river for approximately 1500 feet and includes a public boat ramp. Roberts leased 200 feet of the waterfront park for its docking and parking facilities from defendant city of Bettendorf (City). Their lease was on an oral, month-to-month basis until a written lease was executed in September 1988. Roberts' lease with the City expired on December 30, 1990.

Before commencing riverboat excursions Roberts applied for and obtained necessary construction permits from several state and federal agencies. Roberts then began work in the riverbed and along the shore installing a sanitary sewer and water system and "deadman" anchoring devices. Later Roberts added two other barges and mooring devices to accommodate a ticket office and a gift shop at the docking facilities.

Pursuant to rules and regulations of the Iowa State Conservation Commission and its successor the Iowa Department of Natural Resources (collectively DNR), Roberts also obtained a lease to use a portion of the riverbed adjacent to Leach Park from the Iowa Executive Council (Council). The original DNR lease was issued in June 1984 for five years. It provided:

A parcel of river bed approximately 300 [feet] of frontage by 100 [feet] of depth at Mississippi River Mile 485.5. The area is for barges permanently moored adjacent to property owned by the City of Bettendorf. The barges are used to accommodate excursion boats, a gift shop, and a ticket office, as shown on the attached plat.

Attached to the lease was a drawing of the area showing the City as the owner of the adjacent property. The lease further stated that it

shall not be construed to give the Tenant exclusive use of the land and water of the property above described, to the exclusion of the general public. The right to enter upon the property leased for any lawful purpose is hereby specifically reserved to the public of the state of Iowa.

In February 1989, Roberts requested and obtained a renewal on its riverbed lease. The second lease was issued in April and also covered a five-year period requiring annual rental payments. On the lease application Roberts indicated the use of the area would remain the same as the last five years and that no structures would be added or modified. The same area map was attached to the application. Roberts did not indicate on the application that its lease with the City expired at the end of 1990.

Following the 1989 authorization of excursion boat gambling in Iowa, *see* 1989 Iowa Acts ch. 67 (now codified at Iowa Code ch. 99F (1991)), Roberts and defendant Steamboat Development Corporation (Steamboat) submitted bids for the right to operate a riverboat casino from Leach Park. The City and the Riverbend Regional Authority selected Steamboat to operate riverboat gambling excursions and executed a lease for the river front area in February 1990. Initially Steamboat planned to use the Leach Park site until new docking facilities were constructed upstream. As a result of its agreement with Steamboat the City refused to renew Roberts' lease for the river front property. The City instructed Roberts to remove its boat, barges, and improvements by March 10, 1991. Roberts removed its boat and the barges, but left the improvements in place.

Steamboat began construction on docking improvements for its riverboat operations in late March 1991. While attempting to sort out problems with Steamboat's construction and operating permits, the City discovered that Roberts' lease with DNR of the riverbed

area extended until April 1994. Roberts apparently offered to assign its lease rights at one point, but the City refused to pay the requested compensation. Later the City and Steamboat jointly executed a DNR lease application for the riverbed area. City Attorney Greg Jager explained that Roberts was no longer using the leased riverbed because its lease of the river front property had expired.

In response, Michael Carrier, an administrator of the Parks, Recreation & Preserves Division of the DNR explained that Roberts' permits "either need to be canceled or assigned to the City of Bettendorf." Jager then requested that Roberts' lease be terminated based on certain alleged misrepresentations Roberts made on its application for renewal concerning the status of the City's property. Roberts disputes that there were any misrepresentations on the application form.

Carrier, on behalf of the DNR staff, recommended that the Natural Resource Commission (Commission) approve termination of the lease "based on the fact that Roberts no longer had control of the riparian frontage adjoining the leased riverbed and had removed its excursion boat and barge from the area." Carrier also offered to refund the 1991 lease payment. The Commission approved the staff's recommendation over Roberts' objection and threat of legal action. Before the matter was presented to the Council in September, the Attorney General's office asked the City to indemnify the State from any liability resulting from termination of the lease. The City refused to make such an agreement. Ultimately the Council voted not to terminate Roberts' lease.

Steamboat, however, continued to occupy the Leach Park docking area and operated riverboat gambling excursions from April 1991 to July 1992. During this period Roberts' attorney contacted counsel for Steamboat and the City several times claiming they were trespassing on its leasehold property. At no time after March 1991 did Roberts attempt to dock its boats at Leach Park. On April 7, 1992, Roberts filed suit against Steamboat and the City. In its amended and

substituted petition Roberts raised claims of trespass, conversion, conspiracy to trespass and to convert property, implied contract, interference with contract, and slander and libel. Defendants filed answers and the City counterclaimed against Roberts asserting conversion, material misrepresentation, and conspiracy. The City also filed a third-party petition against the State of Iowa (State) claiming an unconstitutional taking of its riparian rights.

Subsequently Steamboat and the City filed a motion for summary judgment on all claims. The State joined their motion and also moved for summary judgment on the City's third-party claim. Roberts moved for a partial summary judgment on its claims of trespass, conspiracy, and defamation.

Following a hearing on the motions, the district court denied Roberts' motion, granted summary judgment in favor of the defendants and overruled the State's motion as moot. The court concluded that (1) the DNR lease did not grant Roberts exclusive use of the riverbed adjacent to the City's park absent an ability to perform the conditions of the lease; (2) civil conspiracy is not actionable without a valid underlying claim; (3) Roberts failed to produce evidence to support its claims under theories of quasi-contract or interference with contract; and (4) defendants' communications concerning Roberts were substantially true. Roberts appeals from the court's ruling and judgment.

On appeal Roberts contends that summary judgment was improper because (1) the riverbed lease was not dependent on the river front lease; (2) the lease entitled Roberts to exclusive use of the area as against all other commercial ventures; (3) Roberts did not abandon the leasehold; (4) a trespasser is liable for benefits received from the wrongful occupation and use of property, and in any event fact issues remain concerning Roberts' damages; (5) actual breach of the lease is not a required element of an interference claim; and (6) the City's allegations of misrepresentation were not substantially true or privileged. We will discuss additional facts as necessary.

## II. Scope of Review.

Our review of the court's summary judgment ruling is well settled. *See* Iowa R.Civ.P. 237(c). We first determine whether, under the entire record, any genuine issues of material fact exist. "If there are none, then we determine whether the trial court correctly decided that the moving party is entitled to judgment as a matter of law." *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust,* 470 N.W.2d 336, 338 (Iowa 1991); *accord Ottumwa Hous. Auth. v. State Farm Fire & Casualty Co.,* 495 N.W.2d 723, 726 (Iowa 1993). We view the evidence in the light most favorable to the resisting party. *Hoefer,* 470 N.W.2d at 338.

Although intentional torts "are generally poor candidates for summary judgment because of the subjective nature of motive and intent ..., the rule is not absolute...." *Id.* The party resisting summary judgment "must set forth specific facts constituting competent evidence to support a prima facie claim." *Id.* at 339; *see also Jones v. Palmer Communications, Inc.,* 440 N.W.2d 884, 889 (Iowa 1989); Iowa R.Civ.P. 237(e).

## III. Trespass and Conspiracy.

The overriding issue on appeal is whether the state-authorized lease granted Roberts an exclusive interest in the portion of the riverbed adjacent to Leach Park, absent access to the river front property. Roberts argues that it is entitled to damages because Steamboat, with the City's consent, trespassed on its leasehold and profited from use of the docking facilities and improvements. Roberts claims that although it could not have loaded or unloaded passengers from shore after December 30, 1990, it could have docked its vessels above the riverbed adjacent to Leach Park. While Roberts admits it did not attempt to occupy the disputed area after removing its riverboat and barges, it continued to pay rent and to claim a property interest in the leased area. The district court determined that Roberts' interpretation of the lease would be contrary to the purpose of the lease program, the express language of the authorizing statute and the lease conditions, and the City's riparian rights.

To resolve this basic issue we must determine what rights Roberts acquired through the DNR "lease." This, in turn, requires us first to determine what rights the State possessed as to the bed of the river.

### A. Public Trust Doctrine.

In general, the State of Iowa exercises concurrent jurisdiction and authority with the federal government over navigable waters. *See* Iowa Code §§ 1.1, 1.2 (1991). The Mississippi River is of course a navigable river. *McManus v. Carmichael,* 3 Iowa 1, 56–57 (1856). "The State owns the bed of the river from the ordinary high-water mark to the center of the stream." *State v. Sorensen,* 436 N.W.2d 358, 361 (Iowa 1989). Such ownership, however, "is not proprietary but is in the nature of a trusteeship, which confers upon the state a burden rather than a benefit...." *Peck v. Alfred Olsen Constr. Co.,* 216 Iowa 519, 522, 245 N.W. 131, 132–33 (1932); *accord Sorensen,* 436 N.W.2d at 361–62.

When Iowa was admitted to statehood, Congress declared that the state holds title to navigable waters in its sovereign capacity and in trust for all of its citizens. *Sorensen,* 436 N.W.2d at 361. Although the "public trust" doctrine was originally intended to protect commercial navigation, *Peck,* 216 Iowa at 525–26, 245 N.W. at 134–35, it has been expanded to safeguard the public's use of navigable waters for purely recreational and non-pecuniary purposes. *See Sorensen,* 436 N.W.2d at 363; *McCauley v. Salmon,* 234 Iowa 1020, 1022–23, 14 N.W.2d 715, 716 (1944).

Owners of land adjacent to navigable waters possess certain common law rights, apart from those of the general public, which are incidents of riparian ownership. *See generally* 78 Am.Jur.2d *Waters* § 265, at 710 (1975); 65 C.J.S. *Navigable Waters* § 61, at 212–13 (1966). We have recognized that a riparian owner's right of access to the water is a property right. *Peck,* 216 Iowa at 527, 245 N.W. at 135. Yet this right is also subject to "the right of the government to maintain and promote navigation by whatever reasonable means...." *Id.* at 525, 245

N.W. at 135–36; *see also Lakeside Boating & Bathing Inc. v. State,* 344 N.W.2d 217, 221–22 (Iowa 1984).

 Under its trusteeship the State's power to dispose of lands under navigable waters is closely circumscribed. *Sorensen,* 436 N.W.2d at 362. Today the DNR has jurisdiction over all meandered streams and lakes. Iowa Code § 111.18 (Iowa Code chapter 111 is now codified at Iowa Code ch. 461A (1993)). Pursuant to its police power the State requires permits for construction on or over state-owned land or water or to operate commercial concessions on public lands. *Id.* § 111.4.

Applications to lease riverbed areas are usually requested to accommodate facilities to load and unload commercial vessels or to improve access to the river from riparian land. Iowa Code section 111.25 provides in part:

> The commission may recommend that the executive council lease property under the commission's jurisdiction. All leases shall reserve to the public of the state the right to enter upon the property leased for any lawful purpose. The council may, if it approves the recommendation and the lease to be entered into is for five years or less, execute the lease in behalf of the state and commission.

Rental fees have been established for the commercial and industrial use of riverbed, lakebed, and waterfront land according to the size of the area. *See* 571 Iowa Admin.Code § 18.2 (1990).

B. Rights Under "Lease."

 Roberts' initial lease of the riverbed adjacent to Leach Park was subject to a number of provisions and conditions. The lease was designated commercial and approved use of the described area for excursion boats, a gift shop, and a ticket office. The lease incorporated the language of the statute relating to the public trust doctrine. The DNR reserved the right to terminate the lease "upon any of the grounds specified in Section 648.1 of the Code of Iowa or for violation of any terms of this lease." The renewed lease was identical.

Roberts argues that the lease granted it a superior right to possession over all other commercial ventures for that portion of the riverbed, during the entire lease term. Roberts further argues that the State had no basis to terminate the lease. We believe this issue can be resolved by determining whether the DNR "lease" is a true lease or whether it is in effect a license. *See generally Lee v. North Dakota Park Serv.,* 262 N.W.2d 467 (N.D.1977).

 It is often difficult to distinguish between a lease, an easement, and a license. *See* 49 Am.Jur.2d *Landlord and Tenant* § 5, at 45–47 (1970); 25 Am.Jur.2d *Easements and Licenses* § 2, at 417–19, § 3, at 419, § 123, at 525–26 (1966). The title of an instrument is not controlling; the intent of the parties is the determining factor. *Paul v. Blakely,* 243 Iowa 355, 358, 51 N.W.2d 405, 407 (1952).

 A lease on the one hand conveys a present interest in real property for the period specified. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 13, at 67 (5th ed. 1984) [hereinafter *Prosser & Keeton*]. Black's Law Dictionary defines a lease as "[a] contract for exclusive possession of lands ... for terms of years ..., usually for a specified rent or compensation." Black's Law Dictionary 889 (6th ed. 1990); *see, e.g., State v. Mann,* 463 N.W.2d 883, 884 (Iowa 1990). "[T]he criterion seems to be the right to the possession of the land, and if such right is not conferred, the transaction is to be deemed a license, profit, or easement." 49 Am.Jur.2d *Landlord and Tenant* § 5, at 46.

 On the other hand, a license in real property "is an authority or permission to do a particular act or series of acts upon the land of another." *Resnick v. City of Ft. Madison,* 259 Iowa 578, 583, 145 N.W.2d 11, 14 (1966); *see also* Black's Law Dictionary 920. A license also involves the exclusive occupation of the property, but only "so far as is necessary to do the act, and no further, whereas a lease gives the right of possession of the land, and the exclusive occupation of it for all purposes not prohibited by its terms." 49 Am.Jur.2d *Landlord and Tenant* § 5, at 46; *see also* 25 Am.Jur.2d *Easements and*

*Licenses* § 123, at 525–26, § 125, at 528; *Lee,* 262 N.W.2d at 470–73. Thus, a license is merely a "privilege to use land in the possession of another." *Resnick,* 259 Iowa at 583, 145 N.W.2d at 14. It is generally personal, revocable, and unassignable. *Paul,* 243 Iowa at 358, 51 N.W.2d at 407.

Applying the foregoing principles of law to the instrument executed by the DNR and Roberts, we conclude the "lease" is in fact a license, and not a true lease. In accordance with Iowa Code sections 111.4 and 111.25 and the public trust doctrine the State has the authority *to permit the use* of the bed of a river for certain specified purposes, subject to the paramount right of navigation vested in the federal government for the benefit of all the public. Roberts' lease permitted occupation of the riverbed to accommodate excursion boat operations from the City-owned park.

▮ We believe the agreement in this context must be construed so as to limit Roberts' commercial operations to those activities consistent with and for the specified purpose for which consent was given. To hold otherwise would yield a result which is contrary to the limitations imposed by the public trust doctrine and inconsistent with the purposes of the State lease program. Moreover, the State may not interfere with riparian rights unless the purpose has "a reasonable and substantial relationship to ... navigational or other public purpose to which the riparian owner's right of access is made subservient by law." *Lakeside Boating & Bathing,* 344 N.W.2d at 221. Accordingly, we conclude that Roberts' right to use the riverbed was conditioned upon access to the City's frontage property.

The record does not bear out Roberts' contentions of alternate uses for the riverbed area which would reasonably fall within these bounds. Further, we find that Roberts voluntarily relinquished its right of use when it vacated the premises. We therefore hold that Roberts did not acquire a property interest in the riverbed area under the lease agreement. For all practical purposes Roberts' license to use the area terminated when the lease with the City expired.

Having determined that Roberts acquired only the rights of a licensee we turn now to the trespass claim.

### C. Nature of Trespass.

▮ The gist of a claim for trespass on land is the wrongful interference with one's possessory rights in property. *Ryan v. City of Emmetsburg,* 232 Iowa 600, 603, 4 N.W.2d 435, 438 (1942).

One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally

 (a) enters land in the possession of the other, or causes a thing or a third person to do so, or

 (b) remains on the land....

Restatement (Second) of Torts § 158 (1964).

▮ For purposes of a trespass claim a person who is "in possession" of land is defined as one who

(a) is in occupancy of land with intent to control it, or

(b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or

(c) has the right as against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).

*Id.* § 157. Even if Roberts possessed a right to exclusive possession of the leased area as against Steamboat, it still must establish that at the time of the alleged interference it was in either actual or constructive possession of the property. *Id.; see also Prosser & Keeton* § 13, at 77–78; 75 Am.Jur.2d *Trespass* § 37, at 35–36 (1991); 87 C.J.S. *Trespass* § 22(a), at 972–73 (1954).

▮ Actual possession or occupancy of land "may be shown by [public] acts of ownership or dominion." 75 Am.Jur.2d *Trespass* § 38, at 36–37; *see also* 87 C.J.S. *Trespass* § 22(b), at 973–74; Restatement (Second) of Torts § 157 cmt. a. Here Roberts vacated the leased property in March 1991 when it removed its riverboat and barges. After Roberts had vacated the area, Steamboat

began construction on the docking facilities and began operating excursions from Leach Park. We believe that Roberts' payment of rent, without other indicia of physical dominion, is insufficient to establish actual possession.

Similarly, we conclude Roberts was not in constructive possession of the property. "Constructive possession is that possession which the law presumes the owner has, in the absence of evidence of exclusive possession in another.... If defendant is in actual possession, constructive possession is excluded." 87 C.J.S. *Trespass* § 22(c), at 974; *see also* Restatement (Second) of Torts § 157(b), (c); *Prosser & Keeton* § 13, at 78. There is no presumption of possession on the part of a licensee because a license gives the licensee merely a right to use land "in the possession of another." *See Resnick*, 259 Iowa at 583, 145 N.W.2d at 14. Because Roberts cannot establish that it was in possession of the property on which the acts of trespass allegedly occurred, its claims must fail.

### D. Conspiracy Claim.

■ Likewise, Roberts cannot maintain conspiracy to trespass claims against Steamboat and the City if its trespass claims fail. We have recognized that "[c]ivil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the action." *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 233 (Iowa 1977); *accord Lindaman v. Bode*, 478 N.W.2d 312, 317 (Iowa App.1991). Consequently, the district court properly entered summary judgment for defendants on the trespass and conspiracy claims.

### IV. *Implied Contract.*

■ Roberts argues that because Steamboat, with the City's consent, wrongfully occupied and used the leased riverbed, the law implies a promise to pay Roberts the benefits each received from the riverboat gambling excursions. The court found that Roberts failed to set forth specific facts to support its claim that defendants were unjustly enriched at Roberts' expense.

■ An implied contract claim invokes principles of restitution rather than contract. *See generally* 1 Samuel Williston *Williston on Contracts* § 1:6, at 25–28 (Richard A. Lord 4th ed. 1990); Restatement (Second) of Contracts § 4 cmt. b. " 'Restitution' and 'unjust enrichment' are modern designations for the older doctrine of quasi contracts or contracts implied in law, sometimes called constructive contracts." *Glass v. Minnesota Protective Life Ins. Co.*, 314 N.W.2d 393, 397 (Iowa 1982) (quoting *Smith v. Stowell*, 256 Iowa 165, 173, 125 N.W.2d 795, 799–800 (1964)). "Unjust enrichment is an equitable principle mandating that one shall not be permitted to unjustly enrich oneself at the expense of another or to receive property or benefits without making compensation for them." *West Branch State Bank v. Gates*, 477 N.W.2d 848, 851–52 (Iowa 1991); *accord Irons v. Community State Bank*, 461 N.W.2d 849, 855 (Iowa App.1990).

Roberts contends it would be unjust to permit the defendants to retain the profits from Steamboat's operations because a superior right to use that portion of the riverbed remained with Roberts. Because we have concluded that Roberts' right to use the riverbed adjacent to Leach Park was conditioned upon permission to use the City's property, it would be contrary to equity to imply a promise to pay any restitution here. Moreover, there is no evidence in the record, aside from the 1991 lease payment, that defendants were unjustly enriched in any manner. *See Irons*, 461 N.W.2d at 855. We hold the court did not err in ruling for defendants on the implied contract claims.

### V. *Interference With Contract.*

■ Roberts also argues that the City improperly interfered with the performance of its lease agreement with the State. Roberts claims that it was forced to spend considerable time, effort, and expense to prevent a breach of the lease. The court ruled that Roberts tendered no proof on two essential elements of an intentional interference claim, and in any event the City's actions were not improper. We agree.

When the City attempted to obtain a riverbed lease for Steamboat's operations, it

was informed that Roberts still possessed a lease for that area. To protect its financial stake in Steamboat's operations and its own property interests the City requested that the DNR terminate Roberts' lease. To this end the City informed the DNR that Roberts no longer had access to the river front park and had vacated the area. The City also suggested that Roberts had misrepresented its interests on the lease application. The DNR staff then made a recommendation to the Commission to terminate the lease. The Commission approved the recommendation and presented the matter to the Council. Attorneys for the parties submitted comments prior to and during a hearing held by the Council. The Council later refused to approve the termination.

■ Intentional interference with a contract requires proof of the following elements:

(1) The existence of a valid contractual relation,

(2) Knowledge of the relationship,

(3) Intentional interference inducing or causing a breach or termination of the relationship, and

(4) Resultant damage to the party whose relation has been disrupted.

*Irons,* 461 N.W.2d at 857 (citing *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 244 (Iowa 1988)). While Roberts concedes the lease was not actually breached or terminated by the State, it asserts that a breach is not required to support a cause of action for interference under section 766A of the Restatement (Second) of Torts (1979).

The Restatement provides:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract *or causing his performance to be more expensive or burdensome,* is subject to liability to the other for the pecuniary loss resulting to him.

*Id.* § 766A (emphasis added); *see also Toney v. Casey's General Stores, Inc.,* 460 N.W.2d 849, 852 (Iowa 1990). To support the argu-

ment that a defendant may be held liable for the increased costs of performing a contract, Roberts cites to several decisions. Yet, our review of these authorities reveals that it was unnecessary for the court to analyze this ground for liability under section 766A because in each case the contracts at issue were either breached or terminated. *See Water Dev. Co. v. Board of Water Works,* 488 N.W.2d 158 (Iowa 1992); *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191 (Iowa 1990); *Iowa Supply Co. v. Grooms & Co. Constr., Inc.,* 428 N.W.2d 662 (Iowa 1988).

The key words in section 766A of the Restatement are "intentionally" and "improperly." *Toney,* 460 N.W.2d at 852. Here there is no question the City Attorney, on behalf of the City, acted intentionally when he contacted the DNR seeking termination of Roberts' riverbed lease. Thus, the question we must answer is whether the City acted improperly. *Id.; see also* Restatement (Second) of Torts § 766A cmts. a, e, § 767.

■ In determining whether the City's interference with Roberts' lease was "improper" we may consider the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interest sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Toney,* 460 N.W.2d at 853; Restatement (Second) of Torts § 767. This determination necessarily involves a balancing process. *See* Restatement (Second) of Torts § 767 cmts. b, j.

[I]t has been suggested that the real question is whether the actor's conduct was fair and reasonable under the circumstances. Recognized standards of business ethics and business customs and practices are pertinent, and consideration is given to

concepts of fair play and whether the defendant's interference is not "sanctioned by the 'rules of the game.'"

*Toney,* 460 N.W.2d at 853 (quoting Restatement (Second) of Torts § 767 cmt. j). Applying these factors to the circumstances of the present case, we conclude the City's actions were not improper.

■ Even assuming the City improperly interfered with Roberts' contractual relationship, Roberts presented no evidence on the required element of damage. *Irons,* 461 N.W.2d at 857; *Bump v. Stewart, Wimer & Bump, P.C.,* 336 N.W.2d 731, 737 (Iowa 1983). Roberts asserts that it suffered damages when it was forced to defend against the City's accusations of misrepresentation and forced to take action to prevent termination of the lease.

■ We believe that the language of section 766A which refers to liability for "causing [the] performance [of the contract] to be more expensive or burdensome" must be interpreted to encompass losses other than expenditures for attorney fees to enforce what is essentially an empty contractual right. Following section 766A the Restatement editors comment:

> If the plaintiff's performance has intentionally been made more burdensome or more expensive by the actor, the cost that he incurs in order to obtain the performance by the third party has increased, and the net benefit from the third person's performance has been correspondingly diminished. This Section covers that loss, too.

Restatement (Second) of Torts § 766A cmt. c. Thus, it appears that the losses to which this provision applies are limited to situations where the plaintiff performs a contractual obligation and "loses all or part of the profits that he [or she] would otherwise have obtained, or is subjected to a financial loss." *Id.* § 766A cmt. g. Clearly this is not such a situation. During the period of Steamboat's operations Roberts did not operate or attempt to operate riverboat excursions. We therefore hold, as a matter of law, that section 766A does not apply in the present case. Accordingly, summary judgment on this count was appropriate.

## VI. *Defamation.*

■ Left for us to consider is Roberts' contention that the court erred in granting summary judgment on its claims against the City for libel and slander. Specifically, Roberts asserts City Attorney Jager made oral and written statements accusing Roberts of misrepresenting its property interests on the 1989 lease renewal application. The court concluded defendants had established the complete defense of "substantial truth." *See Behr v. Meredith Corp.,* 414 N.W.2d 339, 342 (Iowa 1987).

■ "The gist of an action for libel or slander is the publication of written or oral statements which tend to injure a person's reputation and good name." *Lara v. Thomas,* 512 N.W.2d 777, 785 (Iowa 1994). Under certain circumstances publication of a defamatory statement may be protected by a privilege. "A privilege may be either absolute, in which event there can be no liability under any circumstances, even if actual malice is shown, or it may be conditioned or qualified, which provides immunity in some, but not all, instances." *Higgins v. Gordon Jewelry Corp.,* 433 N.W.2d 306, 308 (Iowa App.1988). Generally, it is for the court to decide whether the defense of qualified privilege is available for the statement in question. *Jones,* 440 N.W.2d at 892; *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 116 (Iowa 1984).

■ A qualified or conditional privilege encompasses communications

> made in good faith on any subject matter in which the person communicating has an interest, or in reference to which that person has a right or duty, if made to a person having a corresponding interest or duty in a manner and under circumstances fairly warranted by the occasion.

*Lara,* 512 N.W.2d at 785 (quoting *Knudsen v. Chicago & North Western Transp. Co.,* 464 N.W.2d 439, 442 (Iowa 1990)); *see also Rees v. O'Malley,* 461 N.W.2d 833, 837 (Iowa 1990). The protection of a qualified privilege is lost, however, on proof of actual malice. *Vinson,* 360 N.W.2d at 116.

The communications relied upon by Roberts include oral statements made by Jager to the DNR, the Attorney General's office, and the Council. Jager also sent a letter from Jager to the Council. Pursuant to its statutory authority of approval over riverbed leases the Council accepted comments from and heard arguments from counsel for the parties.

The statements at issue asserted that the City believed Roberts had made material misrepresentations on the application form concerning its rights to the City's property in order to obtain a renewed lease from the State. The City suggested that such representations should be grounds for termination of the riverbed lease. Roberts strongly argues that it made no statements which can be construed as misrepresentations and that in February 1989 it believed the City would renew its river front lease by the end of 1990.

Under the circumstances we conclude the City Attorney's statements were privileged "unless shown to have been made with actual malice." *Knudsen,* 464 N.W.2d at 443; *see also Vinson,* 360 N.W.2d at 116. "Actual malice requires proof that the statement was made with malice in fact, ill-will or wrongful motive." *Vinson,* 360 N.W.2d at 117. Nothing in the record suggests that the City's communications met this high standard. Consequently, we must reject Roberts' contention that the court erred in its determination on the defamation claim.

VII. *Disposition.*

For the reasons set forth we hold the district court correctly resolved all claims raised in Robert's petition by entry of summary judgment for defendants.

**AFFIRMED.**