# IN THE COURT OF APPEALS OF IOWA

No. 23-0612
Filed May 22, 2024

**DUKE CARTER,**
        Plaintiff-Appellant,

**vs.**

**MIKE FRICKE and LAURA FRICKE,**
        Defendants-Appellees.
_____

Appeal from the Iowa District Court for Monroe County, Crystal S. Cronk, Judge.

A plaintiff appeals the district court's ruling in a quiet-title action rejecting his claim of ownership of a disputed parcel of land by adverse possession. **AFFIRMED.**

S.P. DeVolder of The DeVolder Law Firm, P.L.L.C., Norwalk, for appellant.

Bryan J. Goldsmith and Carly M. Schomaker of Gaumer, Emanuel & Goldsmith, P.C., Ottumwa, for appellees.

Considered by Bower, C.J., and Schumacher and Langholz, JJ.

**LANGHOLZ, Judge.**

Duke Carter sued his neighbors, Laura and Mike Fricke, seeking title by adverse possession over a plot of land—Lot 3—that borders both of their properties. The Frickes bought Lot 3 in November 2020 by quitclaim deed, yet Carter argues his exclusive possession and use of the land during the years before the deed defeats their claim to the land. After a bench trial, the district court held Carter failed to meet his heavy burden to displace the Frickes' deed. And we agree.

In adverse-possession actions, timing is everything. But as Carter testified, he can be "bad with dates and times." So while Carter recalled improving the land in 2009 by laying rock for a driveway and building a small shed, aerial photos undermine his recollection—showing no shed in 2012 and no driveway until 2020. And although Carter believed he paid the lot's taxes starting in 2009, he does not appear on the tax records until 2013. Thus, even if Carter eventually acted as sole possessor of Lot 3—accumulating property, housing horses, paying taxes, and maintaining the land—we cannot find proof of ten straight years of hostile, exclusive possession.

Because the law favors regular title, and Carter has not shown clear and positive proof of hostile, exclusive possession of Lot 3 for ten years, we affirm the district court's judgment that the Frickes are the sole lawful owners of Lot 3 and its dismissal of Carter's trespass claim.

I.

This case involves three neighboring parcels of land—Lots 1, 2, and 3—in Burn's Addition to the Town of Melrose, Iowa. Carter has lived on Lot 2 for over

thirty years. The neighboring Lot 1 was originally owned by—and was the residence of—Debra and Ervin Wilcoxson. The Wilcoxsons also owned the disputed parcel—Lot 3. The northern half of Lot 3 bordered their Lot 1 and the southern half of Lot 3 bordered Carter's Lot 2.

The Wilcoxsons were older and had some health problems, so Carter helped maintain their land. He would mow both their lots, shovel their driveway, and pick up in the yards—"just neighborly stuff." Carter "never asked for money" for mowing or other upkeep of Lot 3, and he "would never take it" if they offered, as he was "just doing neighborly deeds."

According to Carter, Debra approached him in the spring of 2009 about selling the southern half of Lot 3. Carter testified he paid $500 in cash in exchange for the southern half of Lot 3, and Debra signed a note stating, "Ervin & Debra Wilcoxson receive $500 for ½ south side Lot 3." But the note is not dated or notarized, and Carter never recorded the alleged conveyance. And according to Debra's daughter, Amanda, the note was not written in Debra's handwriting and Debra would not have called the land "Lot 3," as she always referred to it as "Burn's Lot." Carter also claims that later that fall, Debra orally gave him the remaining northern half of Lot 3 in exchange for fixing Debra's deck. No written conveyance for this half of Lot 3 was ever recorded either.

Carter testified that quickly after obtaining the whole of Lot 3, he began altering the property. He recalled laying rock to create a driveway and building a small shed to house his wife's "theatrical" yard decorations. And he believed he made these improvements in fall 2009. Yet aerial photos of Lot 3 contradict his timeline. A September 2012 photo shows neither a driveway nor a shed. The

shed appears in an October 2015 photo, and the driveway finally appears in a September 2020 photo. By summer 2012, Carter had placed some wire fencing on the northern border of Lot 3. Beyond these changes to the property, Carter also continued mowing the grass and stored personal items on the lot, including vehicles and a boat.

As for financial obligations, Carter testified to paying taxes on Lot 3 starting in 2009. But tax records introduced at trial showed Carter did not begin paying taxes on Lot 3 until 2013. Still, Carter believes he paid the Wilcoxsons for the taxes between 2009 and 2013.

Debra passed away from cancer in 2011, and the next year Ervin sold his house (and thus Lot 1) to Laura Fricke and her sister, Elizabeth. In 2015, Ervin passed away intestate, so all property passed to his and Debra's daughter, Amanda.

Amanda was close with her parents—visiting the Wilcoxsons nearly every weekend and stepping in to handle their finances when Debra was diagnosed with cancer in 2009. Amanda never saw a $500 payment from Carter—which would have been a lot of money to her parents—nor did her parents ever mention selling Lot 3. Indeed, Amanda was confident her parents never sold the lot, as shortly before he died, Ervin told Amanda he no longer wanted Lot 3 and asked her to contact Carter about buying the lot. Amanda called Carter about a possible sale, but he never returned her calls.

According to Amanda, the Wilcoxsons permitted Carter to store some items on Lot 3. That permission continued even after Ervin died, as Amanda was not

currently using the land and "Dad said it was okay." At all times, Amanda believed either she or her parents owned Lot 3.

Consistent with this belief, Amanda sold Lot 3 to the Frickes by quitclaim deed on November 18, 2020. Amanda also filed an Affidavit of Death, which swore Ervin and Debra owned Lot 3, they both died intestate, and the property passed to Amanda upon their deaths. The next week, the Frickes informed Carter they now owned Lot 3 and asked him to remove his items by the summer. Later that summer, Laura's sister removed some new fencing Carter had placed on Lot 3.

In October 2021, Carter sued the Frickes. He brought a quiet-title claim seeking to establish ownership of Lot 3 by adverse possession and a trespass claim seeking damages for the Frickes' removal of the fence. *See* Iowa Code § 649.1 (2021) ("An action to determine and quiet the title of real property may be brought by anyone, whether in or out of possession, having or claiming an interest therein, against any person claiming title thereto, though not in possession."). The Frickes counterclaimed to declare their ownership of Lot 3. After a two-day bench trial, the district court entered judgment for the Frickes, finding Carter failed to prove he acquired title by adverse possession. Carter now appeals.

II.

Acquiring ownership by adverse possession is difficult—"[t]here are usually no equities in favor of one who claims property of another by adverse possession and his acts are to be strictly construed." *Roberts v. Walker*, 30 N.W.2d 314, 317 (Iowa 1947). To prevail, an aspiring owner must show "hostile, actual, open, exclusive and continuous possession, under claim of right or color of title for at least ten years." *Nichols v. Kirchner*, 40 N.W.2d 13, 16 (Iowa 1949). Each element

must be supported by "clear and positive proof"—inferences are not enough. *Lawse v. Glaha*, 114 N.W.2d 1040, 1046 (Iowa 1962).

Relevant here, hostile possession "must be clear, distinct, and unequivocal. It must convey the clear message that the possessor intends to possess the land as their own." 3 Am. Jur. 2d. *Adverse Possession* § 39 (footnote omitted). Merely using the disputed property "is insufficient to establish hostility," although "substantial maintenance and improvement of the land" could tip the scales toward hostile possession. *Louisa Cnty. Conservation Bd. v. Malone*, 778 N.W.2d 204, 208 (Iowa Ct. App. 2009). And again, the possession must be for at least ten years because "[t]he doctrine of adverse possession is based on the ten-year statute of limitations for recovery of real property" in Iowa Code section 614.1(5)(a). *Carpenter v. Ruperto*, 315 N.W.2d 782, 784 (Iowa 1982).

We review a quiet-title claim asserting adverse possession de novo. *Sille v. Shaffer*, 297 N.W.2d 379, 380–81 (Iowa 1980); *see also* Iowa Code § 649.6 (providing that quiet-title action "shall be conducted as other actions by equitable proceedings").

On appeal, Carter's argument goes like this: Carter bought the southern half of Lot 3 in spring 2009, was orally given the northern half in fall 2009,[1] since that

---

[1] Carter argues these two conveyances show "claim of title or color of right [sic]" without specifying which theory he is pursuing. The two inquiries, while sometimes used interchangeably, are in fact distinct. *I-80 Assocs., Inc. v. Chicago, Rock Island & Pac. R.R. Co.*, 224 N.W.2d 8, 10 (Iowa 1974). "A claim of right (as distinguished from color of title) as a basis for the acquisition of title by adverse possession, need not be based on writing." *Id.*; *see also* 3 Am. Jur. 2d *Adverse Possession* § 111 (noting color of title usually requires proof of writing). Carter points only to these alleged conveyances to satisfy the claim-or-color requirement, yet only one involved a written document. Without further advocacy, we are left to

time he alone has used and improved upon the land, and thus he acquired ownership by the end of 2019, a year before the 2020 quitclaim deed. But under the heavy burden of proof in adverse-possession cases, we cannot find clear and positive evidence to support ten years of continuous, hostile possession—none of Carter's evidence to start the clock in 2009 withstands scrutiny.

First, Carter cannot rely on his consistent use of Lot 3, primarily storing his property on the lot, because Carter cannot show such use was hostile to the Wilcoxsons or Amanda. Amanda credibly testified that her parents permitted Carter to store items on Lot 3, and that when she took ownership, she likewise extended that permission. "Possession that is permissive in its inception may become hostile for purposes of adverse possession but only when the permission has been withdrawn or when events have occurred indicating that the original permission is no longer obtained." 3 Am. Jur. 2d *Adverse Possession* § 46 (footnote omitted). Consequently, to prove that possession evolved from permissive to hostile, Carter must show "a disclaimer of the title from" the original owner or "an actual hostile possession of which [the original owner] has notice or which is so open and notorious as to raise a presumption of notice." *Lawse*, 114 N.W.2d at 904.

Carter has not shown any such break in the status quo. There is no evidence the Wilcoxsons or Amanda asked him to remove his items and he refused, nor any evidence of them withdrawing their permission. So while Carter

---

speculate how these conveyances amount to claim of right or color of title. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) (declining to "speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments").

indeed stored items—and continued to accumulate items over the years—that alone is not enough under these facts.

Similarly, Carter cannot rely on performing regular yard maintenance of Lot 3, as he clarified he helped with snow removal and lawn care to be a "good neighbor[]," not because he believed the land was his. Carter points to nothing in the record disrupting the routine of "neighborly deeds" sufficient to place the Wilcoxsons or Amanda on notice that, at some point, Carter believed he now owned the land. Thus, Carter has failed to prove hostile use of Lot 3 since 2009.

Nor can Carter point to specific improvements to start the clock in 2009, as Carter has failed to prove those improvements occurred at that time. Though Carter recalled laying rock for a driveway and building a shed that year, aerial photos show no shed as of September 2012, and the driveway does not appear in either the 2012 or 2015 photos. So too with the wire fence, which according to Carter's wife was erected close in time to building the shed. While all parties agree that some wire fencing was in place by summer of 2012, given the testimony that it was erected close in time to the shed, we cannot find that fencing was in place in 2009.

Next considering property taxes, Carter's evidence again falls short of proving his timeline. Carter's name does not appear on Lot 3's tax records until 2013. At trial, Carter testified he paid the Wilcoxsons for the taxes, Carter's wife testified she paid taxes at the recorder's office in person, and Amanda testified she paid the taxes while managing her parents' finances. Left as we are to reconcile the discrepancies and weigh credibility, we cannot find clear and positive proof Carter took responsibility for Lot 3's taxes before 2013.

Finally, we find insufficient evidence to show Debra conveyed any part of Lot 3 to Carter in 2009. Starting with the southern half, the district court did not find Carter's testimony on this issue credible. Instead, the court credited Amanda's testimony that the note was not written in her mother's handwriting, her mother did not refer to the land as "Lot 3," and that because she oversaw the finances by that point, she would have known if they received $500. Though not binding on us, we give weight to the court's firsthand observations of live testimony. *See In re Marriage of Shanks*, 758 N.W.2d 506, 511 (Iowa 2008). And on our own review, Carter's undated, unnotarized, and unrecorded note lacks sufficient indicia of authenticity, and thus cannot trigger the ten-year possession period.

As for the northern half, Carter is confident he was orally given the northern half as payment for the deck, and Amanda is confident it was never sold and that Ervin instead wished to sell it to Carter shortly before he died. Without Debra or Ervin present to break the tie, we are left with Carter's word against Amanda's. Given the district court's credibility findings, Carter's custom of helping the Wilcoxsons with no expectation of payment, and the lack of any recorded conveyance, we see no clear and positive proof the northern half of Lot 3 was conveyed in 2009.

Viewing the record as a whole, we agree with the district court that the earliest Carter's conduct could support exclusive dominion is fall 2012—when the fence was in place and the earliest time the shed could have been built. Yet the Frickes notified Carter of their deed in November 2020, eight years later. Thus, Carter has failed to show ten years of uninterrupted, exclusive possession of Lot 3.

Because Carter cannot show he acquired title by adverse possession, we agree that the Frickes are the sole lawful owners of Lot 3. And since Carter does not own Lot 3, his claim of trespass on that property also necessarily fails. *See Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 301–02 (Iowa 1994), *overruled on other grounds by Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004).

**AFFIRMED.**