John & Mary DOE as Parents and John & Mary Doe as Guardians on behalf of John Doe, Jr., Plaintiffs,

v.

**BAXTER HEALTHCARE CORPORATION, et al., Defendants.**

Cutter Biological, a Division of Miles, Inc., et al., Intervenors–Defendants.

John & Mary Doe as Parents and John & Mary Doe as Guardians on behalf of John Doe, Jr., Plaintiffs,

v.

Cutter Biological, a Division of Miles, Inc., et al., Defendants.

**John Doe, II, Plaintiff,**

v.

Cutter Biological, a Division of Miles, Inc., et al., Defendant.

Nos. 4–96–CV–10738, 4–96–CV–10843, 4–96–CV–10844.

United States District Court, S.D. Iowa, Central Division.

Sept. 27, 2001.

David N. May, Bradshaw, Fowler, Proctor & Fairgrave, Glenn L. Norris, Hawkins & Norris, James W. Carney, Carney, Appleby & Brewick, PLC, Steven P. Wandro, Wandro & Associates, PC, E. Ralph Walker, Harley Erbe, Walker Law Firm, George F. Davison, Jr., Des Moines, IA, Warren L. Bush, Wall Lake, IA, Fabrice N. Vincent, Donald C. Arbitblit, Charles R. Kozak, Lieff, Cabraser, Heimann & Berstein, LLP, San Francisco, CA, Thomas J. Vilsack, Bell & Brau Law Office, Mt. Pleasant, IA, for plaintiffs.

David H. Luginbill, Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Roland Peddicord, Peddicord, Wharton, Spencer & Hook, PC, Des Moines, IA, Frank J. O'Hara, Joseph K. Hetrick, Dec-

hert, Price & Rhoads, Philadelphia, PA, C. Barry Montgomery, Hall Adams, III, Gregory W. Beihl, Steven J. Roeder, Tracy A. Campbell, Williams, Montgomery & John, Ltd., Chicago, IL, Kevin J. Stack, Nancy L. Newman, Knapp, Peterson & Clarke, Glendale, CA, Richard A. Stefani, Gray, Stefani & Mitvalsky, Cedar Rapids, IA, Duncan Barr, James A. Beltzer, William B. Dodero, O'Connor, Cohn, Dillon & Barr, San Francisco, CA, Richard J. Sapp, Thomas H. Walton, Nyemaster, Goode, Voigts, West, Hansell & O'Brien, PC, Des Moines, IA, Steven J. Ellison, Sara J. Gourley, Claudia Laurens, Sidley & Austin, Chicago, IL, Joseph L. Marks, Adel, IA, for defendants.

## ORDER

LONGSTAFF, Chief Judge.

THE COURT HAS BEFORE IT the following motions for summary judgment, all filed on or about June 28, 2001: 1) Baxter Healthcare Corporation's ("Baxter") motion in case numbers 4–96–cv–10738 and 4–96–cv–10843 (collectively, "John Doe I") based on an alleged failure to prove causation; 2) Baxter's motion in case number 4–96–cv–10844 ("John Doe II") based on an alleged failure to prove causation; 3) Alpha Therapeutic Corporation's ("Alpha") motion in John Doe I based on an alleged failure to prove causation; 4) Alpha's motion in John Doe II based on an alleged failure to prove causation; and 5) Armour Pharmaceutical Company's ("Armour") motion in both cases based on an alleged failure to prove causation.[1]

Defendant Cutter Biological, ("Cutter/Bayer")[2] resisted Baxter's motion in John Doe II on July 26, 2001 and plaintiffs resisted all motions on July 30, 2001. Defendants filed reply memoranda, and the Court held a hearing on September 7, 2001. Following the hearing, plaintiffs filed supplemental exhibits containing excerpts from recent depositions of two of defendants' medical experts. Defendant Armour, on behalf of all defendants, responded to the supplement on September 17, 2001. The motions are fully submitted.

## I. FACTS

### A. Overview and Procedural History

The above-captioned cases, originally filed in state court in 1996 and removed shortly thereafter to this Court, are part of a large pool of cases filed by or on behalf of young men and boys afflicted with various forms of hemophilia who contracted the HIV virus and, in many cases, AIDS itself, from blood products allegedly manufactured by the defendant pharmaceutical corporations.

Hemophilia is a bleeding disorder that inhibits the blood from clotting and coagulating normally. The treatment of hemophilia involves the infusion of the missing blood factor components necessary to stop bleeding. In the early to mid 1980s, the missing components commonly were supplied in the form of a concentrate, through blood products known generally as "Factor VIII and Factor IX." The defendant pharmaceutical corporations were among the manufacturers of Factor VIII and IX products.

---

1. Alpha, Baxter and Cutter/Bayer have all joined in Armour's motion. Cutter/Bayer also filed a separate statement of facts to supplement those submitted by Armour in support of its motion.

2. Bayer Corporation is the successor-in-interest to Cutter Biological, which itself was a division of Miles, Inc. Accordingly, the term "Cutter/Bayer" will be used to refer to products and/or statements attributed to Cutter Biological, Miles, Inc. and Bayer.

The Judicial Panel on Multidistrict Litigation ("MDL") consolidated the blood factor concentrate cases in what became known as MDL–986, and assigned the matter to the Honorable John F. Grady, United States District Judge for the Northern District of Illinois. Judge Grady managed the discovery of "common-issues" under a series of pre-trial orders. The above-captioned cases were returned to this Court in the Spring of 1999.

Plaintiffs' Amended and Substituted Complaints ("Complaints") in the present cases set forth allegations of negligence and negligence per se [3] with regard to the production, sale and distribution of defendants' blood factor concentrates.[4] In particular, plaintiffs allege that the defendant pharmaceutical corporations failed to exercise reasonable care in recruiting and screening donors of plasma used to produce the concentrates, in failing to manufacture the concentrates using anti-viral techniques, in failing to warn physicians and the hemophiliac community of the dangers associated with Factor VIII and Factor IX products, and in failing to exercise reasonable care in recalling Factor VIII and Factor IX once the risks of infection became clear.

Although not enumerated as separate counts in the complaints, plaintiffs also allege defendants engaged in a civil conspiracy to, among other things, withhold and/or revise warnings and otherwise downplay the risk of AIDS while encouraging the continued use of potentially dangerous products, actively resist both product recalls and required screening of high risk donors, and lobby the FDA to acquiesce in their position on the topics.

### B. John Doe I

The following facts either are undisputed or are viewed in a light most favorable to plaintiffs. John Doe I, Jr. ("Doe I") was born on September 24, 1978. He was diagnosed with type A hemophilia when he was between nine and ten months of age, due to an incident of excessive bleeding. Type A hemophilia is characterized by the lack of blood Factor VIII, which is necessary for blood coagulation and clotting. To treat his condition, between November 24, 1979 and April 27, 1981, Doe I received infusions of cryoprecipitate.[5] Doe I's mother testified in deposition that the initial cryoprecipitate was from Spencer Community Hospital in Spencer, Iowa, although the medical records submitted by plaintiffs suggest the initial infusion occurred at the Sioux Valley Hospital.

Beginning in late 1979 or early 1980, Doe I's physicians [6] also treated his condition through the infusion of Factor VIII concentrate, a blood product made from plasma taken from multiple donors that also assists in the coagulation and clotting of blood.[7] Factor concentrate is a freeze-

---

**3.** Counsel for plaintiffs stated during the hearing they did not plan to go forward with their negligence per se claim.

**4.** In their resistance to the pending motions for summary judgment, plaintiffs also assert a claim for civil conspiracy. This claim is addressed below.

**5.** Cryoprecipitate is made by freezing plasma, thawing it, and isolating Factor VIII from the plasma through centrifugal concentration.

**6.** It appears that C. Thomas Kisker, M.D. of the University of Iowa Hospitals and Clinics supervised Doe I's treatment during most if not all of the relevant time period.

**7.** Plaintiffs contend the first infusion of Factor VIII concentrate occurred in May 1980. Cutter/Bayer disputes this date, and has produced a December 19, 1979 letter from the University of Iowa Hospitals and Clinics to Doe I's family physician indicating four bottles of Factor VIII concentrate were sent home with Doe I's parents on that date. The

dried product, developed by removing the particular factor component (Factor VIII or IX) from plasma.

It is plaintiffs' position that from May 1980 to September 1983, Doe I received Factor VIII concentrate produced by Cutter/Bayer, with the exception of two infusions of Alpha Factor VIII concentrate in May and June 1980. They also contend that in December 1983 through the end of 1984, John Doe I infused exclusively Factor VIII concentrate produced by Armour.

According to the records relied upon by plaintiffs, John Doe I received prescriptions for Factor VIII concentrates manufactured by defendants Cutter/Bayer, Armour and Alpha on the following dates:

Bayer: May 22, 1980; August 13, 1980; October 13, 1980; November 26, 1980; August 3, 1981; March 22, 1982; July 19, 1982; October 7, 1982; December 9, 1982; April 11, 1983; July 18, 1983 and September 6, 1983.

Armour: December 2, 1983; January 24, 1984; February 7, 1984; September 14, 1984; November 19, 1984.

Alpha: May 20, 1980 and June 15, 1980.[8]

It is important to note, however, that plaintiffs admit there are inaccuracies in these records.[9] Furthermore, one of plaintiffs' own experts suggests Doe I infused substantial quantities of concentrate made by unidentified entities that are not included within these prescriptions.[10]

Doe I's supervising physician, C. Thomas Kisker, M..D., stated it was his belief that the U of I pharmacy contracted to purchase one manufacturer's product at any given time, but deferred to pharmacy personnel for an accurate response. Doe I's mother stated in deposition that Dr. Kisker first prescribed the Cutter/Bayer product, Koate, which she remembers from its distinctive orange packaging. A chart prepared by plaintiffs of Cutter/Bayer's shipping records also shows that a regular supply of Factor VIII product was shipped to the U of I between 1980 and 1984.[11] The Court notes, however, that the number of lots contained in each shipment varied considerably.

In January 1985, Doe I began infusing heat-treated factor concentrate, which he then infused exclusively through July 1987. The parties agree that heat-treated concentrate does not transmit the HIV virus.[12]

In July 1987—at 8 years of age—Doe I tested positive for the HIV virus. None of plaintiffs' experts can pinpoint the actual

---

letter does not indicate the manufacturer of the cryoprecipitate.

8. Doe I's mother also stated in deposition Doe I received an American Red Cross factor concentrate on a few occasions.

9. Charts kept by hospital and/or pharmacy personnel identify the products given to John Doe I from May 1980 to December 30, 1983 as "Ko8", a Cutter/Bayer product. Although the lot numbers associated with each infusion describe Baxter product, plaintiffs agree with defendant Cutter/Bayer that the lot numbers are incorrect, since they pertain to heat-treated lots that were not available until 1984.

10. James Mosley M.D., indicated there is a discrepancy in the records as to the number of times Doe I actually received infusions of Factor VIII concentrate between 1980 and 1985.

11. Defendants object to the consideration of plaintiffs' shipping report as lacking in foundation and undisclosed in response to interrogatories submitted. The Court will address these contentions below.

12. Since 1987, type A hemophilia has generally not been treated with virus-transmitting products, but rather, through a highly purified concentrate known as monoclonal antibody factor concentrate.

time of infection.[13] James Mosley, M.D. has opined that Doe I was infected with HIV after mid–1983. William Robison, M.D. has opined that Doe I was infected around February 1983. Roger Grimson, Ph.D. has opined that Doe I was infected with HIV on or after August 1983. Robert Remis, M.D. has opined there is a 5% chance Doe I was infected in 1980; a 5% chance the infection occurred in 1981; a 25% chance Doe I was infected in 1982; a 35% chance Doe I was infected with HIV in 1983, a 25% chance he was infected in 1984; and a 5% chance the infection occurred in 1985.

Plaintiffs contend it is impossible to identify which particular infusion, i.e., product, caused Doe I's infection due to the fact an individual can be exposed to HIV and not necessarily become infected. Rather, the risk of HIV infection through infusion of factor concentrates depended on the strength, or concentration of infectious material in the product infused, the quantity of concentrate used and an individual's particular susceptibility to HIV.

### C. John Doe II

John Doe II, Jr. ("Doe II") was born on September 28, 1977. He was tested for hemophilia shortly after birth because his older brother also suffered from hemophilia. Doe II was diagnosed with type B hemophilia, which is characterized by Factor IX deficiency.

Doe II's treatments were supervised by Dr. Kisker of the U of I, and administered locally by Sixto Guiang, M.D. at the Burlington Medical Center ("BMC"). Doe II received fresh frozen plasma once in 1978,

twice in 1979 and ten times in 1980. He received a transfusion of whole blood on February 26, 1984.

Doe II also was treated on various occasions with infusions of Factor IX concentrate prescribed by Dr. Kisker at U of I and obtained from the Burlington Medical Center ("BMC"). Evidence taken from the Multi District Litigation ("MDL") depository shows Cutter/Bayer shipped multiple lots of Factor IX concentrate to the BMC between 1980 and 1984.[14] Darwin Cooley, the Director of the BMC pharmacy in the 1980s, also testified in a recent deposition it was his recollection that the Cutter/Bayer products, Konyne (Factor XI) and Koate (Factor VIII), were the two factor concentrates his pharmacy stocked during that time period.[15] Dr. Guiang also stated that Cutter/Bayer was the manufacturer of the Factor IX concentrate stocked by the BMC pharmacy during 1984 and 1985.

On January 23, 1985, Doe II sought medical treatment for an illness with symptoms resembling those of primary HIV infection. Plaintiffs' expert, James Mosley, M.D., opines that a primary HIV illness such as that suffered in January 1985 would be expected to manifest itself between two to six weeks after the date of infection. Doe II's records indicate he received infusions of Factor IX concentrate administered at the BMC on December 24, and 25, 1984 and January 1, 1985. Accordingly, it is plaintiffs' theory that based on his January 1985 illness, he likely was infected by one of the three infusions of

---

**13.** Defense experts place the date of infection prior to August 1982, however.

**14.** According to the records produced by plaintiffs, the last shipment of Cutter/Bayer Konyne sent to BMC was in May 1984.

**15.** He admitted, however, that he did not remember the specific time period the pharmacy stocked the concentrates, and that all purchasing records had long since been destroyed.

Factor IX concentrate set forth above.[16]

Meanwhile, Doe II's medical records indicate he received two prescriptions of Baxter's Factor IX concentrate, Proplex®, from the U of I in November 1983, and a third prescription for Proplex® on February 24, 1984. The two earlier dates correspond with the December 1983 date of infection opined by defense expert Paul Volperding, M.D. It also appears that on March 14, 1984, Dr. Kisker saw Doe II and sent him home with unidentified Factor IX concentrate.[17] Baxter and Cutter/Bayer have submitted detailed evidence disputing whether Proplex®, a factor concentrate produced through a process known as cold ethoanol fractionation, is capable of transmitting the HIV virus.

Doe II apparently was not tested for HIV until January 1986. His infection was confirmed by a second test administered in February 1986. Doe II was 8 years old at the time of diagnosis. He died on April 19, 2000, following an automobile accident.

### D. General Facts Regarding Defendants' Overall Liability

It is plaintiffs' theory that Doe I's infection was caused either by Cutter/Bayer or Armour, and that Doe II's infection was caused either by Cutter/Bayer or Baxter, with Cutter/Bayer more likely than not the cause. Plaintiffs have produced evidence that the four named defendants held an 88% to 94.5% share of the national Factor VIII market between 1980 and 1984, and that between 1978 and 1984, the four named defendants had 100% of the Factor IX market in the United States. *See* Declaration of Milan Wickerhauser, Ph.D. at ¶¶ 8–14, 23–25. Defendants object to Dr. Wickerhauser's report based on the fact it was not disclosed to defendants during discovery.[18]

### E. Facts Supporting Plaintiffs' Failure to Warn and Conspiracy Theories

#### 1. Defendants' Knowledge of the Risk

As early as 1981 there was a consensus among specialists and experts in the fields of public health, infectious disease, plasma collection and plasma fractionation that AIDS was a blood borne virus. On July 16, 1982, the Morbidity and Mortality Weekly Reports ("MMWR") of the United States Centers for Disease Control ("CDC") reported three cases of a fatal immunosuppressive disease among hemophiliacs who were heterosexual with no history of intravenous drug use. At a meeting of the American Blood Resources Association ("ABRA") in the fall of 1982, the CDC informed ABRA representatives, among whom were representatives of all four defendants, of the continued increased numbers of AIDS cases among hemophiliacs, IV drug users and homosexual men. The CDC informed the group that the epidemiologic pattern was identical to hepatitis, demonstrating that AIDS was a blood-borne disease.

Baxter/Hyland representative Henry Kingdon, in a memorandum dated January 5, 1983, stated:

---

**16.** At least one defense expert, Paul Volperding, M. D., opined that Doe II was infected by December 1983, and that his medical records "show that he experienced symptoms resembling those of primary HIV infection well before January 1985." Cutter/Bayer's Supplemental App. Exh. 11 at 3 (Joint Defense Expert Report of Paul Volperding, M.D.).

**17.** There is no evidence Doe II was prescribed Cutter/Bayer Factor IX concentrate in 1983 or 1984.

**18.** For reasons that will become apparent in the body of this Order, there is no need to issue a formal ruling at this juncture regarding the admissibility of Dr. Wickerhauser's declaration.

"We have been closely monitoring the AIDS issue at Hyland since the original description of the syndrome in male homosexuals in the December 10, 1981 issue of the New England Journal of Medicine, and more intensively since the first three hemophilia cases were reported in the Morbidity and Mortality Weekly Report from the CDC on July 16, 1982. *Many of us have been involved in considering the problem and in discussion with the CDC on its implication for our blood products ....* Therefore, we have been involved with the CDC and others in the monitoring of this problem long before it became a popular topic in the regular news media."

Exh. 61 to the Declaration of Daniel E. Barenbaum (hereinafter, "Barenbaum Decl.") (Hyland Memorandum from H.S. Kingdon dated Jan. 5, 1983) (emphasis added). In addition, plaintiffs have produced evidence that defendants, or, at the very least, Cutter/Bayer, were aware that the number of hemophiliacs who would eventually contract AIDS was much greater than the number then diagnosed, due to the lengthy period between infection and disease. A Cutter/Bayer internal memorandum dated November 11, 1982 stated that the evidence was "very scary" and that "we are just seeing the tip of the iceberg." Exh. 30 to Barenbaum Decl. (Memorandum from R. Barden, Dated Nov. 11, 1982).

In April of 1983, a "medical update" prepared by Armour summarized nine articles on AIDS from the scientific literature, including one that explicitly "concluded that AIDS in the patient was caused by exposure to a virus or other agent during Factor VIII transfusions." Exh. 53 to Barenbaum Decl. (Medical Update: Armour Pharmaceutical Co., April 1983). On December 16, 1982, Alpha directed that its suppliers begin screening out all males from its donor population who had had sex with another male. Subsequently, following a January 4, 1983 meeting between the CDC and the fractionator defendants, Alpha purchased additional insurance coverage in order to pay for the AIDS claims it expected.

### 2. Alleged Concert of Action

Defendants stopped using plasma from high-risk, homosexual donors to make new concentrates in the summer of 1982. Plaintiffs have produced evidence, however, that despite their collective decisions to discontinue *production* of *new* concentrate, defendants Alpha, Baxter and Cutter/Bayer continued to market concentrates made with high-risk, homosexual male donor plasma for the duration of the two-year shelf-life.

In January 1983, representatives from defendants attended a meeting during which the CDC advocated use of a surrogate test, the hepatitis B core (Hbc) test, that would eliminate almost all high-risk donors. A Cutter/Bayer memorandum dated shortly before the January 1983 meeting states that representatives of all defendants had recently held a meeting and agreed to the idea of proposing a task force as a "delaying tactic" for the implementation of the test. Exh. 38 to Barenbaum Decl. at 2 (Cutter/Bayer Memorandum from Steven Ojala). Cutter began using the test in April 1984, more than a fifteen months after the CDC indicated the test was ready for use. It is not clear from the record when the other defendants began using the test.

An internal Cutter/Bayer memorandum of December 29, 1982 stated that based on the evidence: "It appears ... to be advisable to include an AIDS warning in our literature for Factor IX and Factor VIII." Exh. 56 to Barenbaum Decl. (Cutter/Bayer Memorandum by Ed Cutter dated Dec. 29, 1982). There is no evidence, however, that

Cutter/Bayer carried through with this recommendation. Furthermore, the May 1983 edition of Cutter/Bayer's *Echo* publication referred to the transmissibility of AIDS by stating: "*If* AIDS is transmissible through donated plasma (this had not yet been determined) ...." Exh. 59 to Barenbaum Decl. (*Echo*, May 1983 at 9 (emphasis in original)). Alpha also published in its Summer 1983 issue of *Hemophilia* that: "There is no proof that AIDS is necessarily associated with blood or blood products." Exh. 58 to Barenbaum Decl. (*Hemophilia*, Summer 1983).

Meanwhile, plaintiffs have produced deposition testimony from previous litigation against defendants from Steven Ojala, Ph. D., a Cutter/Bayer principal, indicating during meetings held in 1983 of the Pharmaceutical Manufacturers Association ("PMA") Biological Section, members frequently discussed the wording of warnings, the timing of applications for warnings, and the unity of the four fractionators in the timing of the upgrading of such warnings. Exh. 24 to Barenbaum Decl. (Aug. 6, 1987 Dep. of Steven Ojala, *Doe v. Miles Labs., Inc.*, No. R86–2548 (D.Md.)). An Alpha memorandum summarizing the October 17, 1982 through October 20, 1982 PMA Biological Section Meeting, states with regard to plasma procurement: "We agreed to share our current practices on audits of plasma suppliers," and "it was agreed that we would exchange copies of inspection forms that we considered non-proprietary ... to ensure all of us are doing about the same thing." Exh. 25 to Barenbaum Decl. (Undated Alpha Memorandum).

A Cutter/Bayer memorandum from Steven Ojala regarding "AIDS and FDA," dated December 13, 1982, describes a meeting of the four blood product manufacturers with the FDA, and indicates that when the FDA representative suggested the fractionators exclude high-risk donors from their pools, Michael Rodell, responsible head of Baxter/Hyland, responded on behalf of the fractionators that education of the high-risk donor population in order that they voluntarily exclude themselves was a better option. Exh. 24 to Barenbaum Decl. (Cutter/Bayer Memorandum). A Cutter/Bayer memorandum dated December 21, 1982 reveals that Cutter/Bayer adopted Mr. Rodell's education program. Exh. 27 to Barenbaum Decl. (Cutter/Bayer Memorandum). Subsequently, a July 7, 1983 meeting of all four defendants contained an agenda item stating "Supporting Information and Rational (sic) for a No Recall Position." Exh. 35 to Barenbaum Decl. (Agenda for July 7, 1983 PMA Plasma Fractionator Meeting on AIDS).

Plaintiffs have produced several other memoranda suggesting representatives of the four defendants were meeting regularly to develop an industry position related to AIDS, and to develop an appropriate warning label regarding AIDS for Factor VIII and Factor IX. There is also evidence the defendants agreed to delay FDA implementation of further testing to exclude high-risk donors, and enlisted their trade organization, ABRA, to lobby government officials on the defendants' positions with regard to AIDS issues.

## II. APPLICABLE LAW AND DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment

with such clarity there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## B. CAUSATION

### 1. With Regard to John Doe I

■ Initially, it is important to note that plaintiffs in Doe I do not dispute summary judgment on the negligence claim with regard to defendant Baxter. Rather, it is plaintiffs' position they can prove by a preponderance of the evidence that the Factor VIII concentrate that infected John Doe I with the HIV virus was produced either by Cutter/Bayer, Armour or Alpha. *See* Plaintiffs' Master Statements in Opposition to Defendants' Statement of Facts Regarding Motion for Summary Judgment, Section IV ¶ 4 ("Plaintiffs' experts have reported that Factor VIII concentrate undoubtedly caused Doe I's infection, and the evidence shows that HIV infection could only have been caused by Alpha, Cutter or Armour."). Although the experts disagree as to his actual date of exposure, plaintiffs believe there is sufficient expert testimony on the issue to al-low the jury to make the final determination. This Court disagrees.

### a. Traditional Causation

"It is axiomatic that, in order to prevail on a claim of negligence, the plaintiff must establish that the defendant owed the plaintiff a duty of care, the defendant breached that duty, the breach was the actual and proximate cause of the plaintiff's injuries, and the plaintiff suffered damages." *Novak Heating & Air Conditioning v. Carrier Corp.*, 622 N.W.2d 495, 497 (Iowa 2001). The fighting issue in the present case is the third element-actual and proximate cause.[19]

■ In a products liability action, product identification is critical. The plaintiff must prove his injuries were proximately caused by a product manufactured or supplied by a particular defendant. *Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 858 (Iowa 1994).

Viewing the facts in the light most favorable to plaintiffs, the Court nevertheless concludes plaintiffs are unable to move beyond speculation as to whether a particular defendant's product was the actual and proximate cause of their injuries. *See id.* As set forth in the fact section, the parties do not dispute that all lots of Factor VIII produced during 1980 and 1985 did not pose the same risk of HIV infection. Rather, the risk depended on three factors: 1) the strength or concentration of the infectious material in the product infused; 2) the quantity of concentrate used; and 3) an individual's susceptibility to HIV. *See* Declaration of William Robinson in Opposition to Defendants' Motions for Summary Judgment ("Robinson Decl.") at ¶ 7. Furthermore, "HIV infection did not

---

**19.** The Court acknowledges that defendants do not concede the issues of duty and breach, but because the discussion turns on causa-tion, finds no need to address these other elements.

necessarily occur as a result of the first exposure to HIV-contaminated Factor concentrates." *Id.* at ¶ 7. *See also* Declaration of Louis M. Aledort in Support of Defendant Bayer's Reply to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment ("Aledort Decl.") at ¶ 14 ("HIV infection is not a result of cumulative exposures to the virus."). Even if plaintiffs had been able to produce an accurate chart depicting Factor VIII infusions received by Doe I during the relevant time period, it remains impossible for plaintiffs to identify the particular infusion, and therefore, the particular product, that infected Doe I with the HIV virus. *See, e.g., Gerst v. Marshall,* 549 N.W.2d 810, 815 (Iowa 1996) (summary judgment appropriate where evidence would have required jury to speculate as to proximate causation).

Plaintiffs cite to *Huber v. Watson,* 568 N.W.2d 787, 790 (Iowa 1997), presumably for the premise that circumstantial evidence showing "a reasonable inference of exposure" to a defendant's product is sufficient to establish proximate cause. *Huber* is distinguishable from the facts in the present case. *Huber* involved asbestos, a substance known to cause harm after repeated exposure. Accordingly, a jury could reasonably conclude that circumstantial evidence of an individual's contact with or exposure to a particular asbestos-containing product, " 'coupled with expert testimony regarding asbestos fiber drift and the *cumulative effects of exposure to asbestos*' " was sufficient to prove causation by a particular product. *Id.* (quoting *Beeman v. Manville Corp. Asbestos Disease Compensation Fund,* 496 N.W.2d 247, 254 (Iowa 1993)) (emphasis added).

In the present case, however, the parties agree Doe I became infected by the HIV virus on one particular occasion from one particular product. Unlike the situation with asbestos, the fact Doe I may have been exposed to the virus by other products both before and after his actual date of infection had no impact on his ultimate diagnosis of AIDS.

Even assuming *Huber* is applicable to the case at bar, however, plaintiffs' evidence falls short of creating a "reasonable inference of exposure." *Huber,* 568 N.W.2d at 790. Unlike the situation in Doe II, plaintiffs in Doe I were unable to isolate a "primary HIV illness" that plaintiffs' experts could connect with one or more possible dates of infection. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment at 12. Without such an illness, plaintiffs' experts have been unable to reach a consensus regarding Doe I's possible date of exposure. *See* Plaintiffs' Master Statement of Facts at ¶ 14. As outlined in the fact section, above, James Mosley, M.D. opined that Doe I was infected with the HIV virus after mid–1983. Exh. 4 to Barenbaum Decl. (Mosley Report at ¶ 54). William Robinson, M.D. believes that Doe I was infected with the virus around February 1983. Exh. 5 to Barenbaum Decl. (Deposition of William Robinson, May 16, 2001 at 79). Roger Grimson, Ph.D. opined that Doe I was infected with HIV on or after August 1983. Exh. 6 to Barenbaum Decl. (Expert Report of Roger Grimson at ¶ 22). Robert Remis, M.D. opined there was a 5% likelihood of infection between May and December 1980; a 5% likelihood of infection in 1981; a 25% likelihood of infection in 1982 and a 65% likelihood of infection between 1983 and 1985. Exh. 7 to Barenbaum Decl. (Expert Report of Robert Remis for Doe I at 5). Creating further confusion is the fact Doe I was prescribed at least two brands of Factor VIII concentrate, Cutter/Bayer and Armour, between 1983 and 1985–the time period during which plaintiffs believe Doe I most likely became infected.

This is not the type of evidence envisioned by the *Huber* court as sufficient to create a reasonable inference of causation. The Court grants summary judgment in favor of all defendants with regard to John Doe I under traditional theories of negligence and causation.[20]

### b. Alternative Liability

Without the ability to identify which of defendants' products infected Doe I with the HIV virus, plaintiffs are left to rely on an alternative liability theory. This theory, modeled on section 433B(3) of the Restatement (Second) of Torts (1965), provides:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one caused it, the burden is upon each such actor to prove that he has not caused the harm.

The theory arose from the case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (Ca.1948), in which the plaintiff was injured in a hunting accident by one of two individuals. The *Summers* court determined that both individuals had fired their guns toward plaintiff, and had done so in a negligent manner, but that plaintiff was unable to establish which one fired the bullets that actually caused his injury. *Id.* at 2. Rather than penalize the innocent plaintiff, the court shifted the burden of proof to the two admittedly negligent hunters, the only possible tortfeasors. *Id.* at 4.

As noted by the Iowa Supreme Court in *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 73 (Iowa 1986), a critical element of the alternative liability theory is that all possible tortfeasors are before the court. In *Mulcahy*, a DES case, plaintiffs sued 25 defendants, but subsequently narrowed their alternative liability theory to three defendants shown to have supplied DES to the city in which the drug was obtained. *Id.* at 73–74. Without proof the plaintiffs had brought all possible tortfeasors before the court, the *Mulcahy* court declined to adopt the theory and shift the burden of proof to defendants. *Id.* No other court applying Iowa law has adopted the theory of alternative liability. *See, e.g., Perrin v. A.C. & S.*, 68 F.3d 1122, 1124 (8th Cir. 1995) ("Iowa has not adopted market share or alternative liability . . . .").

Similarly, in the present case, plaintiffs have failed to name all possible tortfeasors as defendants. Regardless of whether this Court accepts the late-disclosed statements of Dr. Wickerhauser purporting to rule out other possible manufacturers of factor concentrate,[21] there is evidence in the record that Doe I may have been infected with the HIV virus through cryoprecipitate infusions received during 1980 and 1981. Plaintiffs' expert Donald Francis, M.D. stated in a supporting declaration that cryoprecipitate is distributed only lo-

---

**20.** Plaintiffs urge the Court to follow *Erickson v. Baxter Healthcare, Inc.*, 151 F.Supp.2d 952, 969 (N.D.Ill.2001). In *Erickson*, another blood factor concentrate case, the district court declined to apply alternative liability based on the court's inability to "conclude that *all possible* defendants are joined as defendants here." The Court then stated without explanation: "However, the evidence that both Baxter and Bayer supplied their products to [the prescribing hospital] in the time surrounding Mr. Erickson's HIV infection is sufficient to create a question of fact, even without alternative liability." *Id.* For the reasons set forth above, this Court does not believe an Iowa court would reach a similar conclusion, and declines to follow the *Erickson* holding.

**21.** The Court takes no position on Cutter/Bayer's suggestion that Doe I may have been infected through infusions of Factor VIII concentrate obtained during the relevant time period from the University of Minnesota.

cally, and because there were no known cases of HIV or AIDS in Iowa through April 1981, cryoprecipitate infusions could not have infected Doe I with HIV. Declaration of Donald Francis, M.D. in Opposition to Defendants' Motions for Summary Judgment, at ¶ 8. The Court finds this conclusory statement insufficient as a matter of law to completely eliminate Doe I's cryoprecipitate infusions as a possible source of his HIV infection. *See* Dep. of Paul V. Holland, M.D. at 60, Exh. A to Armour Pharmaceutical Company's Response to Plaintiffs' Supplemental Exhibits in Opposition to Defendants' Motions for Summary Judgment ("Armour's Suppl. Response") (declining to rule out cryoprecipitate as possible source of Doe I's infection); Dep. of Charles F. Abildgaard, M.D. at 15–16, Exh. B to Armour's Suppl. Response (refusing to agree that "the chance of HIV infection from an Iowa donor of a cryoprecipitate was nil between 1978 and 1980").

■ In short, although plaintiffs' experts may opine the *probability* Doe I was infected before 1982 is relatively low, it remains *possible* that cryoprecipitate was the cause in fact of plaintiff's injuries. Furthermore, it appears plaintiff may have infused factor concentrate not reflected in the records upon which plaintiffs rely. Recognizing its duty to view the facts in a light most favorable to plaintiffs, the Court nevertheless cannot ignore the many discrepancies in plaintiffs' evidence. This evidence consists in part of medical charts purporting to list the type of factor concentrate infused by Doe I, along with the associated lot numbers. Plaintiffs have admitted these charts could not possibly

be accurate. *See* Plaintiffs' Master Statement of Facts at ¶ 17. The other form of evidence submitted by plaintiffs on this issue is Doe I's prescription records from the U of I. Again, these records are necessarily inaccurate and/or incomplete based on the fact they account for only a fraction of the actual Factor VIII infusions Doe I received. *See* Exh. 71 to Barenbaum Decl. (UI–PD 41–50, 52, 54). As argued by Cutter/Bayer, Doe I's prescription records account for only 40,740 units of Koate between May 1980 and September 1983. *See* Cutter/Bayer Exh. 5 (chart depicting cumulative number of units of Koate prescribed during relevant time period). This varies markedly from the 83,000 units and 60,440 units of factor concentrate plaintiffs' experts Mosley and Robinson, respectively, determined Doe I infused during the same time period. *See* Exh. 4 to Barenbaum Decl. (Mosley Report) at 10; Robinson Decl., Exh. A at 3. Application of the alternative liability theory is therefore inappropriate under the facts at bar.[22]

### 2. Causation as to John Doe II

#### a. Armour and Alpha

Plaintiffs' general negligence claim in Doe II does not depend on alternative liability. Rather, as set forth in Section I above, it is plaintiffs' theory Doe II was infected by one of three infusions received in December 1984 and January 1985 of Factor IX concentrate manufactured by Cutter/Bayer. Plaintiffs concede Doe II was not exposed to Factor IX concentrate manufactured by Armour. They also agree Doe II could not have been infected by Factor IX concentrate manufactured by

---

**22.** Plaintiffs urge the Court to follow *Poole v. Alpha Therapeutic Corp.,* 696 F.Supp. 351, 354–55 (N.D.Ill.1988), a blood factor concentrate case in which the court allowed plaintiffs to proceed with a theory of alternative liability. Critical to the *Poole* court's holding

was its conclusion that "plaintiffs have identified all of the defendants that could have possibly caused Poole to contract AIDS," a conclusion this Court cannot reach in the present case. *See id.* at 354.

Alpha, due to the fact the first Alpha product to which Doe II was exposed was Alpha Nine, which was not introduced to the market until 1991–several years after he tested positive for the HIV virus.[23] Summary judgment is therefore appropriate in favor of Armour and Alpha with regard to Doe II's general negligence claims.

### b. Cutter/Bayer and Baxter

In support of their theory that Doe II's HIV infection was caused by his infusion of Cutter/Bayer's product, plaintiffs have submitted the following evidence:

1) Doe II's medical records indicating he received infusions of Factor IX concentrate from BMC on December 23, and 24, 1984 and January 1, 1985. Exh. 75 to Barenbaum Decl.; see also Declaration of Sixto Guiang, M.D. in Opposition to Defendants' Motions for Summary Judgment at ¶ 4 ("Guiang Decl.") (indicating a telephone consultation record mistakenly recorded the dates as "11/23" and "11/24");

2) shipping records produced by Cutter/Bayer to the MDL depository indicating Cutter/Bayer shipped Konyne to BMC as late as May 1984. See Strauss Decl. and accompanying exhibits;[24]

3) a declaration by the physician who administered Doe II's infusions at BMC confirming that Cutter/Bayer product had been shipped to the facility, and was in stock and likely administered to Doe II on the three dates at issue. See Guiang Decl. at ¶ 4; and

4) an expert witness opinion that on January 23, 1985, Doe II sought treatment for symptoms resembling primary HIV infection, see Exh. 4 to Barenbaum Decl. at ¶ 30 (Mosley Report), and that primary HIV illness is generally expected to manifest itself between two to six weeks after the date of infection.

As with Doe I, there is evidence in the record indicating Doe II received infusions of other blood products which could potentially have infected him with the HIV virus. For example, there is no dispute Doe II received fresh frozen plasma, as well as transfusions of whole blood as late as February 26, 1984. See Plaintiffs' Master Statement of Facts at ¶ 40.[25] Also like Doe I, the record suggests Doe II may have received infusions of at least two brands of Factor IX concentrate. See, e.g., Exh. 76 to Barenbaum Decl. (showing U of I prescriptions for Baxter (Hyland Travenol) product).

Unlike Doe I, however, in Doe II plaintiffs have supported their theory regarding Doe II's probable date of infection and the responsible product. First, they have produced evidence which establishes a nexus between what they believe to have been the likely dates of infection and a resulting primary HIV illness in 1985. Plaintiffs in Doe II also have produced testimony from the manager of the pharmacy that sup-

---

**23.** Cutter/Bayer resists summary judgment in favor of Alpha "to the extent that unidentified factor concentrate infusions may be supplied by Alpha." See Cutter/Bayer's Reply to Plaintiffs' Master Statement of Facts at 11.

**24.** Defendants have objected to this evidence as lacking in foundation and previously undisclosed. In light of the numerous discovery difficulties that have plagued this litigation, as well as the fact defendants have ample time to evaluate Mr. Strauss' statements and accom-

panying exhibits between now and next spring, when Doe II is set for trial, the Court declines to exclude the evidence.

**25.** As noted earlier in the Order, there is evidence in the record that cryoprecipitate and whole blood components are in fact capable of transmitting HIV. Cutter/Bayer has submitted evidence that 95 % of recipients of whole blood components donated by persons infected with the HIV virus contracted the virus themselves. Aledort Aff. at ¶ 15.

plied the Factor IX concentrate to Doe II that it was his belief that BMC stocked Cutter/Bayer's Konyne and Koate exclusively during the relevant time period. Exh. 64 to Barenbaum Decl. (Cooley Dep. at 12:21–13:1). Testimony from pharmaceutical personnel was lacking in Doe I.

■ Perhaps most importantly, in Doe I, plaintiffs submitted a number of expert witness reports that conflict markedly as to the possible dates of infection. This fact would have placed the jury in the difficult if not impossible situation of having to weigh the credibility of plaintiffs' own experts before they could even begin to evaluate defense contentions. No such conflict exists in Doe II.[26] The Court therefore denies summary judgment on plaintiffs' general negligence claim in Doe II with regard to defendant Cutter/Bayer only.

In an attempt to ensure it is not the only defendant remaining in this portion of the litigation, Cutter/Bayer has filed a resistance to Baxter's motion for summary judgment in Doe II, in which it disputes Baxter's claim that the sole Baxter product shown to be infused by Doe II, Proplex®, is incapable of transmitting the HIV virus.[27] See Defendant Bayer's Resistance to Defendant Baxter's Motion for Summary Judgment, and supporting documents. Plaintiffs' have not adopted this position. Furthermore, as noted by Baxter, the record is devoid of expert witness testimony opining that Baxter Proplex®

was a likely cause of Doe II's HIV infection—a crucial element in products liability claims.

"Iowa law does not appear to require plaintiff to present expert testimony in all cases in order to prevail in a products liability action." Wernimont v. International Harvestor Corp., 309 N.W.2d 137, 141 (Iowa Ct.App.1981). Such testimony is critical, however, if there is a "fact issue upon which the jury needs assistance to reach an intelligent or correct decision." Id.; see also Reed v. Chrysler Corp., 494 N.W.2d 224, 226 (Iowa 1992) (citing Wernimont). Clearly, whether a particular blood component was the likely cause of Doe II's HIV infection is such an issue.

Accordingly, the Court finds summary judgment is appropriate in favor of Baxter with regard to plaintiffs' general negligence claim in Doe II. If the case proceeds to trial, Cutter/Bayer is free to use the Proplex® evidence in its defense.

## C. CIVIL CONSPIRACY/CONCERT OF ACTION

All defendants also seek summary judgment on plaintiffs' civil conspiracy claim, claiming first that plaintiffs failed to plead the cause of action in their amended complaints, and second, that Iowa courts do not recognize a cause of action for civil conspiracy/concert of action absent the

---

**26.** The Court acknowledges the opinion of plaintiffs' expert Robert Remis, M.D. that "John Doe II was most likely infected in late 1984 and almost certainly infected during the period January 1984 to March 1985", Exh. 15 to Barenbaum Decl. at 4 (Report of Robert S. Remis, M.D., in Doe v. Baxter Healthcare Corp.). This opinion is substantially consistent with plaintiffs' primary expert report, that of James Mosley, M.D., who opined that the infusions of concentrate responsible for Doe II's infections were those given between

November 24, 1984 and January 1, 1985. Exh. 4 to Barenbaum Decl. at 18 (Mosley Report).

**27.** Baxter prepared Proplex® through cold ethoanol fractionation, a process it claims entirely eliminates the possibility it could transmit the HIV virus. See Baxter's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment Based on Plaintiffs' Failure to Prove Causation at 3.

presence of an underlying intentional tort.[28]

### 1. Whether Plaintiffs Have Adequately Pled Conspiracy/Concert of Action

With regard to defendants' procedural argument, the Court notes the Complaints do not enumerate civil conspiracy and/or concert of action as separate causes of action. Nevertheless, paragraphs 15 through 20 of plaintiffs' Complaints describe in relative detail the conduct comprising the alleged conspiracy and/or concert of action, ranging from jointly resisting the imposition of a strict donor screening program to collectively agreeing to avoid a product recall to jointly agreeing to avoid warning patients of a possible risk of infection. Doe I Complaint at 6–7; Doe II Complaint at 6–7. Plaintiffs set forth similar charges as part of their general negligence claims in Count I of the Complaints, albeit without reference to an alleged conspiracy. Doe I Complaint at 9–10; Doe II Complaint at 9–10.

■ As the United States Supreme Court held in *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), all that is required under Rule 8(a)(2) of the Federal Rules of Civil Procedure is " 'a short and plain statement of the claim' " that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (Quoting Rule 8). Clearly, plaintiffs' Complaints set forth with sufficient particularity the al-

leged conspiratorial acts upon which plaintiffs base their claims.

Furthermore, the Court notes that in his March 6, 2001 Ruling on plaintiffs' motions for leave to amend, Judge Walters specifically referenced plaintiffs' conspiracy and concert of action theory, and directed plaintiffs to modify the paragraphs of their Complaints pertaining to these claims. *See* Ruling on Motions for Leave to Amend at 6. Defendants cannot now claim they lacked fair notice of plaintiffs' conspiracy theory such that they were unable to prepare an adequate defense.

### 2. Whether Summary Judgment is Nevertheless Warranted

Assuming the Court finds plaintiffs have adequately pled causes of action for civil conspiracy and/or concert of action, defendants nevertheless contend summary judgment is warranted because plaintiffs base their claims on alleged *negligence*, rather than on one or more intentional tort. *See Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 302 (Iowa 1994) (quoting *Basic Chems. Inc. v. Benson*, 251 N.W.2d 220, 233 (Iowa 1977)) (" 'Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the actions.' "). In resisting defendants' motions, plaintiffs concede that the act underlying a civil conspiracy must be intentional, but disagree that the conduct must rise to the level of an intentional tort.[29]

---

**28.** Contrary to defendants' assertions, the Court finds plaintiffs have submitted sufficient evidence of concerted action to survive summary judgment on the merits. *See* Plaintiffs' Master Statement of Material Facts at ¶¶ 59–60, 85, 90, 95–111. *But see Poole*, 696 F.Supp. at 354 (declining to allow plaintiffs to amend complaint to add concert-of-action theory, based on finding that plaintiffs "assert[ed] that defendants committed parallel tortious acts," rather than evidence that the

defendants pursued a common plan or scheme).

**29.** Plaintiffs do not dispute their conspiracy/concert of action theory is based on allegedly negligent conduct, *see* Plaintiffs' Resistance Memorandum at 32, and, in fact, have expressly enumerated the conduct supporting their conspiracy claim as separate acts of negligence under their general negligence

In *Basic Chemicals,* the Iowa Supreme Court defined the claim of civil conspiracy as follows: "A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful." *Basic Chems.,* 251 N.W.2d at 220. "The principal element of conspiracy is an agreement or understanding between two or more persons to effect a wrong against or injury upon another." *Id.* at 233. *Basic Chemicals* has been cited for this premise in numerous Iowa cases. *See, e.g., Tubbs v. United Central Bank, N.A.,* 451 N.W.2d 177, 184 (Iowa 1990); *Cora v. Strock,* 441 N.W.2d 392, 394 (Iowa Ct.App.1989); *Adam v. Mt. Pleasant Bank & Trust Co.,* 387 N.W.2d 771, 773 (Iowa 1986); *Bump v. Stewart, Wimer & Bump, P.C.,* 336 N.W.2d 731, 737 (Iowa 1983). In fact, *Basic Chemicals'* seemingly unequivocal language recently caused one federal judge interpreting Iowa law to conclude: "[B]ecause conspiracy requires an agreement to commit a wrong, there can hardly be a conspiracy to be negligent—that is, to intend to act negligently." *Wright v. Brooke Group Ltd.,* 114 F.Supp.2d 797, 836 (N.D.Iowa Sept.29, 2000) (Bennett, C.J.); *see also Rogers v. Furlow,* 699 F.Supp. 672, 675 (N.D.Ill.1988) ("conspiracy to commit negligence [is] a paradox at best"); *Campbell v. A.H. Robins Co.,* 615 F.Supp. 496, 500 (W.D.Wis.1985) ("inexplicable" that defendants could conspire to cause negligent harm).

Less than two weeks after *Wright,* however, the Iowa Supreme Court decided the case of *Walls v. Jacob North Printing Co., Inc.,* 618 N.W.2d 282 (Iowa Oct. 11, 2000), in which it clearly opened the door to a concert of action claim founded on negligence. In *Walls,* a roofer injured in a fall from an unstable ladder sued the building lessee and shipper, claiming that employees from one or both entities moved and negligently replaced the ladder, thereby causing him to fall when he attempted to descend. *Id.* at 284.

In affirming the district court's grant of summary judgment for the defendants, the Iowa Supreme Court focused on whether the plaintiff could "establish that his injuries were proximately caused by the negligence of an identified defendant." *Id.* at 285. During the summary judgment proceedings, evidence was presented that prior to the plaintiff's fall, one of his co-workers had overheard a conversation involving unknown individuals about moving the ladder in order to move a shipment of paper through the nearby garage door. *Id.* at 284. Plaintiff relied upon this alleged conversation and argued that he need not identify a particular defendant, "because persons committing tortious acts in concert may be held individually liable for the resulting harm." *Id.* (citing Restatement (Second) of Torts § 876, at 315 (1965)).

The *Walls* court appeared to accept plaintiff's theory of the case, and cited to comment a of the Restatement section at issue, which states that in order to prove concerted action, a plaintiff must show "that the parties acted 'in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result.'" *Id.* (quoting Restatement (Second) of Torts § 876 comment a). Because the plaintiff lacked any evidence as to whom was involved in the alleged conversation about moving the ladder, and could not prove moving the ladder was a joint decision, the court found the defendants were entitled to summary judgment. *Id.* at 286.

claim. *See* Doe I Complaint at 9–10; Doe II Complaint at 9–10.

Significantly absent from the *Walls* court's analysis, or, for that matter, the Restatement definition of the concert of action theory, however, is the requirement that the conspirators agree to commit an *injurious* result,[30] a key element in the definition of civil conspiracy set forth in *Basic Chemicals* and its progeny. *See Basic Chems. Inc.*, 251 N.W.2d at 233 ("The principal element of conspiracy is an agreement or understanding between two or more persons to effect a wrong against or injury upon another."). Furthermore, in a case decided in February of this year, the Iowa Supreme Court summarized the *Walls* court's holding in a parenthetical phrase, and again suggested that a concert of action theory could be founded on negligence: "record permitted inference that one of two defendants may have destabilized ladder without warning roofer but record insufficient to connect a defendant, acting alone or in concert with the other, to negligent act." *Novak Heating & Air Conditioning v. Carrier Corp.*, 622 N.W.2d 495, 499 (Iowa 2001).[31]

Subsequent to both *Walls* and *Novak*, in recognition of the uncertainty of Iowa law,

the *Wright* court granted the plaintiffs' motion to certify several questions to the Iowa Supreme Court, among them being whether, under Iowa law, a plaintiff may "bring a civil conspiracy claim arising out of alleged wrongful conduct that may or may not have been an intentional tort— i.e., strict liability for manufacturing a defective product or intentionally agreeing to produce an unreasonably dangerous product." *See* May 3, 2001 Order Certifying Questions of Law to the Iowa Supreme Court, slip op. at 5, *Wright v. Brook Group Ltd.*, No. C99–3090MWB (N.D.Iowa). Although negligent conduct per se is not referenced in the certified question, this Court finds the act of "intentionally agreeing to produce an unreasonably dangerous product" to parallel conduct alleged to underly the conspiracy in the present case, namely, intentionally agreeing to retain a potentially dangerous product on the market and intentionally failing to warn users of the risks. *See* Doe I Complaint at 6–7, 9–10; Doe II Complaint at 6–7, 9–10. The Court is therefore confident the Iowa Supreme Court's answer to the certified

---

**30.** Section 876 of the Restatement (Second) of Torts provides:

Persons Acting in Concert

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1977).

**31.** Plaintiffs also cite to the Iowa Court of Appeals' decision in *Robbins v. Heritage Acres*,

578 N.W.2d 262 (Iowa Ct.App.1998) for the proposition that one can conspire with another to commit negligence. The Court rejects this interpretation of *Robbins*.

In *Robbins*, a former nursing home resident filed a negligence action against the nursing home claiming, among other things, that the administration and staff had conspired to deprive him of necessary medical care. *Robbins*, 578 N.W.2d at 263. The district court dismissed Mr. Robbins' claims, and the Iowa Court of Appeals subsequently reversed this decision, finding: "We cannot say Robbins is unable to sustain a civil conspiracy claim under any state of facts under the petition." *Id.* at 265. In reaching this conclusion, however, the Court of Appeals characterized the conduct underlying the plaintiff's conspiracy allegations as breach of contract and/or a violation of the standards of professional care. *Id.* Neither of these underlying claims are equivalent to negligence.

question at issue will have a direct impact on the question facing this Court in the present case.

On the date of issuance of this Order, the Court is informed that final briefs are currently being submitted by the parties in *Wright*, and that a date for oral argument has not yet been established. Entering a ruling in the present case that may be contrary to the Iowa Supreme Court's ultimate resolution of the issue is imprudent at this juncture, and undoubtedly would give rise to numerous post-trial motions. Accordingly, the Court believes the most appropriate course in the present case is to defer ruling on defendants' motions for summary judgment—with regard to the civil conspiracy/concert of action claims only—until the Iowa Supreme Court has answered the certified questions in *Wright*.

## III. CONCLUSION

For the reasons outlined above, defendant Baxter Healthcare Corporation's ("Baxter") motion for summary judgment [pleading # 175] in case numbers 4–96–cv–10738 and 4–96–cv–10843 (collectively, "John Doe I") is granted with respect to plaintiffs' general negligence and negligence per se claims. Ruling on Baxter's motion with regard to Doe I's civil conspiracy/concert of action theory is deferred pending the Iowa Supreme Court's resolution of the certified questions in *Wright v. Brook Group Ltd.*, No. 01–712 (Iowa 2001). Baxter's motion for summary judgment [pleading # 104] in case number 4–96–cv–10844 ("John Doe II") is granted with

respect to plaintiffs' general negligence claims and granted with respect to plaintiffs' negligence per se claims. Ruling on Baxter's Doe II motion with regard to the civil conspiracy/concert of action theory is deferred pending the outcome in *Wright*. Alpha Therapeutic Corporation's ("Alpha") motion for summary judgment in Doe I [pleading # 167] is granted in favor of Alpha with regard to plaintiffs' general negligence and negligence per se claims, with ruling on the civil conspiracy/concert of action theory deferred. Alpha's motion in Doe II [pleading # 166] is granted with regard to plaintiffs' general negligence and negligence per se claims and deferred pending an outcome in *Wright* with regard to plaintiffs' conspiracy/concert of action theories.[32] Armour Pharmaceutical Company's ("Armour") motion [pleading # 169] in both cases is granted with regard to defendant Armour only on plaintiffs' general negligence and negligence per se claims, and deferred pending a ruling in *Wright* with regard to the civil conspiracy/concert of action claim.

The Court notes that Alpha, Cutter/Bayer and Baxter have all joined in Armour's motion. The Court has already summarized its ruling with regard to Alpha and Baxter in both cases. Summary judgment is granted in favor of Cutter/Bayer on plaintiffs' general negligence and negligence per se claims in Doe I, and deferred with regard to plaintiffs' civil conspiracy/concert of action theory. Summary judgment is denied with regard to plaintiffs' general negligence claims in Doe II

**32.** The Court acknowledges that in its motion for summary judgment in Doe I, Alpha challenges not only the causation element of plaintiffs' negligence claim, but also that Alpha breached a duty to Doe I. Specifically, Alpha alleges it was not aware of the risk of HIV at the relevant time of Doe I's infection with HIV. It also claims its product conformed to the state of the art at the time it

was manufactured. *See* Memorandum in Support of Defendant Alpha Therapeutic Corporation's Motion for Summary Judgment Against John and Mary Doe as Parents and Guardians on Behalf of John Doe, Jr. (Doe I) at 8–10. In light of the Court's ruling with regard to Alpha on the general negligence claims in both Doe I and Doe II, the Court need not address these issues at this juncture.

**1022**

against Cutter/Bayer, granted with regard to their negligence per se claims against Cutter/Bayer. Ruling on the civil conspiracy/concert of action theory is deferred.

In addition, based on representations made by plaintiffs' counsel during the September 7, 2001 hearing, plaintiffs' July 12, 2001 Partial Objections to Magistrate's Order [pleading # 193] are denied as moot.

In light of the above rulings, the Clerk of Court is directed to remove Doe I from the trial calendar. The final pretrial conference, scheduled for October 2, 2001, is cancelled.

IT IS ORDERED.